**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 18-CR-198 (JEB)** |
| | : | |
| **v.** | : | |
| | : | |
| **DARIN CARLYLE MOORE, JR.,** | : | |
| **GABRIEL BROWN,** | : | |
| **JAMES THOMAS TAYLOR, and** | : | |
| **JOHN SWEENEY** | : | |
| | : | |
| **Defendants.** | : | |

**GOVERNMENT'S OMNIBUS RESPONSE IN**
**OPPOSITION TO DEFENDANTS' MOTIONS**

JESSIE K. LIU
United States Attorney
D.C. Bar 472845

___/s/_____
Steven B. Wasserman
D.C. Bar 453251
Laura Crane
D.C. Bar 992454
Assistant United States Attorneys
555 Fourth Street, N.W.
Washington, D.C. 20530
202-252-7719 (Wasserman)
202-252-7667 (Crane)
*Steve.wasserman@usdoj.gov*
*Laura.crane@usdoj.gov*

## <u>TABLE OF CONTENTS</u>

I.      **Procedural and Factual Background** .................................................................. 3

II.     **Response to Defendant Sweeney's Motion to Suppress Cell Site and DNA Search Warrants (ECF 78)**.................................................................................................. 8

III.    **Response to Defendant Brown's Motion for a Bill of Particulars (ECF 79)** .................. 12

IV.     **Response to Defendant Taylor's Motion in Limine to Exclude Statements of Co-Defendants (ECF 89-1)** ............................................................................................ 18

V.      **Response to Defendant Taylor's Motion to Suppress Evidence of Out-Of-Court Identification (ECF 99)** .......................................................................................... 22

VI.     **Response to Defendant Sweeney and Defendant Taylor's Motions to Sever Defendants (ECF 77, 98)** ........................................................................................................ 29

VII.    **Response to Defendant Moore's Motion to Suppress, or in the alternative, Motion in Limine (ECF 75)** ................................................................................................... 39

VIII.   **Response to Defendant Moore's Motion to Dismiss Count Three (ECF 74)** ................. 50

IX.     **Response to Defendant Sweeney's Motion in Limine Regarding DNA (ECF 80)** .......... 53

X.      **Response to Defendant Brown's Motion to Suppress Tangible Evidence (ECF 81)** ...... 58

I.    **PROCEDURAL AND FACTUAL BACKGROUND**

Defendants Moore, Brown, Taylor, and Sweeney are charged with the armed abduction of a Maryland man that began on the evening of June 19, 2018, and continued into the District of Columbia, ultimately concluding in the murder of the kidnapping victim in the early morning hours of June 20, 2018.  On April 4, 2019, a grand jury returned a five-count superseding indictment charging the defendants with: (1) Kidnapping (resulting in death), in violation of 18 U.S.C. § 1201(a)(1); (2) Conspiracy to Commit Kidnapping, in violation of 18 U.S.C. § 1201(c); (3) Using, Carrying, Possessing, Brandishing, and Discharging a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c); (4) First Degree Murder (Premeditated) While Armed, in violation of in violation of 22 D.C. Code §§ 2101, 4502, 2104.01(b)(1), and 1805; and (5) First Degree Murder While Armed – Felony Murder, in violation of  22 D.C. Code §§ 2101, 4502, 2104.01(b)(1).[1]

As set forth in the Indictment, Defendants Moore, Brown, Taylor, and Sweeney conspired to abduct and hold Andre Simmons for ransom.  Simmons was murdered during the course of the abduction in the early morning hours of June 20, 2018, in the rear alley behind the 600 block of Atlantic Street, Southeast.  Beginning in or about May of 2018, the defendants undertook efforts to locate and target Simmons and his associates for robbery.  Defendant Moore's iCloud contained evidence of such efforts, including photographs from social media of Simmons, photographs of Simmons's family's residence, and photographs of a vehicle belonging to one of Simmons's associates.  During the course of the investigation, law enforcement learned of at least two additional efforts by the defendants to target Simmons and his associates prior to the abduction of

---

[1] All four defendants are charged in Counts 1, 2, 4, and 5.  Defendants Moore, Taylor, and Sweeney are charged in Count 3.

Simmons, including a May 21, 2018, armed home invasion at a residence that Simmons and his associates frequented, as well as a May 29, 2018, armed home invasion at an address that the defendants mistakenly believed to be the residence of a close friend of Simmons.

On the afternoon of June 19, 2018, Defendants Brown and Moore exchanged a number of phone calls from approximately noon until shortly before 3:00 p.m.  At 3:11 p.m., Defendant Sweeney contacted Defendant Moore and spoke for more than seven minutes.  There were two brief calls from Defendant Sweeney to Defendant Moore before Defendant Moore's Maxima pulled up to Sweeney's residence on the 600 block of Elmira Street, Southeast, to pick up Defendant Sweeney.  Defendant Sweeney and Defendant Moore then traveled from the District of Columbia to Maryland in Moore's Maxima.  Between 5:40 p.m. and 6:59 p.m., Defendant Brown and Defendant Moore spoke on four separate occasions, including a call at approximately 6:02 p.m. from Defendant Moore to Defendant Brown that lasted more than twelve minutes.

At 8:28 p.m., Defendants Moore and Sweeney drove in Moore's Maxima to 1809 Peachtree Lane – the location of the May 21, 2018, home invasion – in an apparent attempt to locate Simmons.  Moore's Maxima then traveled to St. Michael's Drive, where at approximately 8:38 p.m., Defendants Moore and Sweeney located Simmons, knocked him off of a scooter with Moore's Maxima, pistol-whipped and zip-tied his wrists, before forcing him into the Maxima. Approximately six minutes after Simmons had been forced into the vehicle, Defendant Moore placed a call lasting almost one minute to Defendant Brown; Defendant Brown then immediately tried to call Defendant Sweeney (who is with Defendant Moore), though the call did not connect. Defendant Brown then placed a number of brief calls to Defendant Moore leading up to 9:00 p.m. In the 30 minutes after the abduction, Defendant Brown and Defendants Moore and Sweeney were in contact no less than six times.

At 9:07 p.m., less than 30 minutes after Simmons was forced into Moore's Maxima outside of the Simmons' family residence, Defendant Brown placed a call to Defendant Taylor. Within five minutes of that contact to Taylor, friends and family of Simmons began to receive ransom phone calls from Defendant Taylor's phone. Cell site records show that from approximately 9:00 p.m. until approximately 10:00 p.m., all four defendants and the Maxima congregated in the Benning Park neighborhood in Southeast, Washington, D.C.

Ransom calls continued to be made throughout the night from Defendant Taylor's phone. Although Defendant Brown was not physically in the same location as his co-conspirators in the later portions of the evening, he remained in extensive phone contact with his co-conspirators, including numerous brief calls up until approximately 11:00 p.m. At 11:12 p.m., Brown called Sweeney in a conversation that lasted approximately 22 minutes. At 11:43, Brown again called Sweeney in a call that lasted more than 28 minutes. At approximately 1:12 a.m., Sweeney called Brown in a call lasting approximately 34 minutes. At 1:50 a.m., Defendant Brown called Sweeney in a call that lasted approximately 3 hours and 5 minutes (until 4:55 a.m.). While Defendant Brown was on this call with Sweeney, he drove his girlfriend's black Acura to get gas at approximately 3:20 a.m., before then driving to pick up the money that Simmons's family had arranged to drop off in the 3400 block of Benning Road, Northeast, Washington, D.C. at approximately 4:50 a.m. Law enforcement attempted to stop Brown in the Acura, but he was able to flee from police with the ransom money.

Several additional ransom calls were placed to Simmons's family and friends following the money drop, with the last call from Taylor's cellphone occurring at 6:06 a.m. At 6:23 a.m., ShotSpotter detected 19 gunshots in the rear alley of the 600 block of Atlantic Street, Southeast. Just ten minutes later, Defendant Brown attempted to call Defendant Taylor, who was with

Defendants Sweeney and Moore in the Maxima.  The Maxima then traveled from the scene of the homicide to the residence of Defendant Brown's girlfriend located in Capitol Heights, Maryland, where it stayed for approximately 15 minutes (beginning at approximately 6:44 a.m.).  At approximately 7:11 a.m., the Maxima then traveled to the Lucky Mart, located at 5240 Marlboro Pike, Capitol Heights, Maryland (approximately .2 miles from Brown's girlfriend's residence). Video cameras at the store captured Defendant Taylor exiting the left rear seat of Moore's Maxima and entering the store.  Approximately 30 seconds after Defendant Taylor entered the store, video cameras inside the store recorded Defendant Brown entering.  Both Taylor and Brown exited the market and the Maxima then traveled back into the District of Columbia, dropping Defendant Sweeney off in the 600 block of Elmira Street, SE.  Records the Court Supervision and Offender Services Agency (CSOSA) revealed that Defendant Sweeney's address was listed 612 Elmira Street, SE, at the time of the kidnaping and homicide.  Cell site data for Brown's cellphone revealed that it was located near Bethesda, Maryland shortly before 8:00 a.m.

Defendant Moore then drove the Maxima to his girlfriend's residence located at 12321 Quarterback Court, Bowie, Maryland.  After parking the Maxima, Moore entered his girlfriend's residence and remained inside the residence until law enforcement arrived at the location a short time later.  The Maxima used in the abduction and homicide remained parked outside of the residence.  When law enforcement approached the vehicle, in plain view on the front passenger seat of the Maxima, detectives observed plastic zip-ties consistent with those that were observed on the decedent's wrists.  Additionally, there was damage to the Nissan Maxima that was consistent with the accounts of the witnesses at the scene of the abduction, who advised that the Maxima struck Simmons' moped, as well as another vehicle during the abduction of Simmons.

The Maxima was subsequently searched and processed for evidence and numerous items of evidence linking the defendants to the kidnapping were recovered in the vehicle, including:

- Simmons's DNA profile on the interior of the rear passenger window of the Maxima;

- Simmons's DNA profile on staining that appears to be blood splatter on a black ski mask in the Maxima and Moore's DNA profile on inside of the mask;

- Moore and decedent's DNA profiles on outside of black glove recovered from the Maxima;

- Moore's DNA profile inside of black glove recovered from the Maxima;

- Moore and decedent's DNA profiles on scraping from inside of black glove recovered from the Maxima;

- Sweeney and Moore's DNA profile on another glove in vehicle;

- Moore's DNA profile on inside and outside of blue glove in Maxima;

- Moore and Sweeney's DNA profiles on a water bottle found in the Maxima; and

- Sweeney's DNA profile on a Sprite bottle in the Maxima.

In addition to the DNA evidence, fingerprint evidence was located in the Maxima connecting Defendant Brown to the vehicle. Specifically, Defendant Brown's left palm print was found inside of the interior front driver's side window of the Maxima and Brown's fingerprint was found on the interior rear passenger window of the Maxima. Furthermore, paperwork linked to Brown was recovered from inside of the Maxima.

Additionally, inside of the Acura driven by Brown, law enforcement recovered two disposable blue gloves with a mixture of DNA to include Defendant Moore, Brown, and Sweeney's DNA profiles. Inside of the Acura, law enforcement also recovered a black ski mask with Moore and Brown's DNA profiles on both the inside and the outside of the mask.

The murder weapon was not found in either vehicle – or in Brown or Moore's residences; however, it was later recovered in March of 2019, during the execution of a search warrant at a residence that was the subject of an unrelated narcotics investigation.

## II.   RESPONSE TO DEFENDANT SWEENEY'S MOTION TO SUPPRESS CELL SITE AND DNA SEARCH WARRANTS [ECF 78]

The United States hereby submits this opposition to the Defendant John Sweeney's Motion to Suppress Cellphone and DNA Search Warrants [ECF 78].

### A.   Background

On January 8, 2019, the Federal Bureau of Investigation (FBI), through Special Agent Riley Palmertree, applied for and received a search warrant (19-SW-3) for historical cell site data for T-Mobile cellular telephone number 202-860-3184 (hereinafter referred to as the "Sweeney phone"). The search warrant sought cell site data for the Sweeney phone for the period of "June 10, 2018 at 00:00 (EDT) until June 25, 2018 at 17:00 (EDT)."[2] *See* ECF 78, Exhibit 1 (Attachment B). Defendant John Sweeney moves to suppress "any and all evidence secured as a result of the issuance of the search warrants for both cellphone and DNA analysis related to Defendant." *See* ECF 78 at 1. On January 15, 2018, SA Palmertree applied for and received a search warrant (19-SW-10) to obtain a buccal swab for Defendant Sweeney's DNA.

Both search warrants recounted essentially the same facts establishing probable cause to obtain the requested evidence. The salient facts relating to probable cause summarized in both search warrant affidavits consisted of the following:[3]

---

[2]  A second search warrant (19-SW-80) was obtained for the Sweeney phone on March 11, 2019, which sought historical cell site data for this phone during the period of May 21, 2018 at 00:00 (EDT) until May 31, 2018 at 15:00 (EDT). Defendant Sweeney has not moved to suppress any evidence obtained from the issuance of this warrant.

[3]  All of the bulleted facts set forth below are listed in the affidavits for both search warrants with

- Defendant Sweeney was under supervision with the D.C. Court Services and Offender Supervision Agency (CSOSA), which listed a current address for Sweeney as 612 Elmira Street, S.E., Washington, D.C., and a contact telephone number of 202-860-8134 (the Sweeney phone). ECF 78, Exhibit 1 at ¶ 30-31;

- Co-defendant Brown's family residence was located at 611 Elmira Street, S.E., across the street from Sweeney's residence; *Id.* at p. 14, n. 1;

- The Sweeney phone had approximately 25 contacts with a cellphone used by co-defendant Gabriel Brown (571-351-7471) between June 17, 2018 and June 25, 2018, including calls on the evening of the kidnapping (June 19, 2018) from 8:49 PM – June 20, 2018 at 1:50 AM.  Several of the contacts between the Sweeney phone and Brown's phone were over 20 or 30 minutes in duration. *Id.* at ¶ 32;

- The Sweeney phone had approximately 13 contacts with a cellphone used by co-defendant Darin Moore (301-996-7650) between June 10 and June 25, 2018, including three contacts on June 19, the day of the kidnapping, between 3:11 p.m. and 3:56 p.m.  Additionally, the Sweeney phone had approximately five contacts with the telephone used to make the ransom calls (202-222-8501) on June 10, 2018. *Id.* at ¶ 33;

- A single source male DNA profile was developed from a Sprite bottle recovered during a judicially authorized search of co-defendant Moore's Nissan Maxima, which eyewitness statements and GPS data established was present in the immediate vicinity of the locations of the abduction and subsequent murder of the victim.  The single source DNA profile was entered into the Combined DNA Index System (hereinafter, CODIS).  A match was identified in CODIS to a DNA profile associated with John Sweeney.  *Id.* at ¶ 27-29; and

- The GPS data for the Maxima showed that it traveled to the 600 block of Elmira Street, SE, Washington DC, shortly after leaving the location of the residence of co-defendant Brown's girlfriend.  According to the GPS data, the Maxima stopped in front of 623 Elmira Street, SE for 50 seconds beginning at 7:38 a.m., a little more than one-hour after the homicide.  Law enforcement reviewed footage from a CCTV camera in the 600 block of Elmira Street, SE, Washington, DC during this window of time, and an individual with a physical description consistent with Sweeney can be seen exiting the Maxima in the 600 block of Elmira Street. *Id.* at ¶ 14-15, 30.

B.    Argument

---

the exception of the facts summarized in second bullet point concerning the location of Brown's family residence, which was not included in the buccal swab warrant (ECF 78, Exhibit 2).  The paragraph numbers for the facts summarized below are also slightly different in the buccal swab warrant affidavit than in the cell site warrant as cited below.

It is a well-established principle that "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates,* 462 U.S. 213, 238 (1983). Further, "[a] reviewing court should accord great deference to a magistrate's determination of probable cause." *United States v. Reed,* 195 Fed. Appx. 815, 822 (10th Cir. 2006). The court's duty is "simply to ensure that the magistrate had a substantial basis for ... conclud[ing] that probable cause existed." *Id.* (quoting *Gates,* 462 U.S. at 238-239). This deference is appropriate to further the Fourth Amendment's strong preference for warrants. *See Massachusetts v. Upton,* 466 U.S. 727, 733 (1984); *United States v. Ventresca,* 380 U.S. 102, 105–106 (1965) ("An evaluation of the constitutionality of a search warrant should begin with the rule that the informed and deliberate determinations of magistrates empowered to issue warrants ... are to be preferred over the hurried action of office[r]s"). Because of the strong preference for warrants, "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." *Ventresca,* 380 U.S. at 106.

"The deference accorded a magistrate judge's probable cause determination, however, is not boundless." *United States v. Alabi,* 943 F. Supp. 2d 1201, 1253 (D.N.M. 2013) (citing *United States v. Leon,* 468 U.S. 897, 914 (1984)). The court should not defer to a magistrate judge's probable-cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause. *See United States v. Danhauer,* 229 F.3d 1002, 1006 (10th Cir. 2000). Specifically, the court should not defer to a magistrate judge's probable-cause determination if it "is a mere ratification of the bare conclusions or 'hunches' of

others or where it involves an improper analysis of the totality of the circumstances." *Reed,* 195

Fed. Appx. at 822 (citing *Leon,* 468 U.S. at 915; *Upton,* 466 U.S. at 734; *Gates,* 462 U.S. at 239).

Even when it is ultimately determined that a search warrant was lacking in probable cause, suppression of the evidence seized will not be granted where law enforcement's reliance on the warrant was reasonable. *See United States v. Maxwell*, 920 F.2d 1028, 1034 (D.C. Cir. 1990) ("the exclusionary rule should not be applied to exclude evidence seized pursuant to a defective search warrant if the officers conducting the search acted in 'objectively reasonable reliance' on the warrant and the warrant was issued by a detached and neutral magistrate").

The facts set forth in the search warrant affidavits in support of the request for historical cell site date for the Sweeney phone and the buccal swab for Sweeney's DNA were more than sufficient to establish probable cause.  Both search warrant affidavits firmly linked Sweeney through his cellphone to the cellphones used by all three of his co-defendants, including multiple contacts during the time period leading up to the kidnapping and homicide, as well as during the period of time when the offenses were being committed.  Furthermore, a CODIS match of Defendant Sweeney's DNA profile to DNA recovered from a Sprite bottle seized from inside co-defendant Moore's Nissan Maxima provided strong evidence that Sweeney was inside this vehicle during the commission of the charged offenses.  Contrary to the defendant's claim in his motion, there was significant evidence establishing Sweeney's presence inside the Nissan Maxima during the period when the offenses were committed.  Specifically, the evidence set forth in the affidavits included the recovery of the Sprite bottle with Sweeney's DNA from inside the Maxima, the phone activity with his co-defendants during the time period of the offenses, and the CCTV footage capturing the Maxima stopping in the 600 block of Elmira Street, SE (where Sweeney lived a short

time after the victim's murder), during which a person consistent with Sweeney's physical description can be observed exiting the Maxima.

In the event that it is determined that the challenged search warrants lacked probable cause, the government submits that law enforcement officers reasonably relied on the warrants, which were issued by a neutral and detached magistrate. Accordingly, the government further submits that the evidence obtained as a result of these search warrants should not be excluded under the Exclusionary Rule. *Maxwell,* 920 F.2d at 1034.

Wherefore, the government requests that Defendant Sweeney's Motion to Suppress Cell Site and DNA Search Warrants be denied.

## III. GOVERNMENT'S RESPONSE TO DEFENDANT BROWN'S MOTION FOR A BILL OF PARTICULARS [ECF 79]

Defendant Brown moves this Court to require the government to file a bill of particulars seeking essentially three categories of information: (1) clarification on what theory of liability the government intends to prove that the defendant committed the kidnapping charged in Count One and Count Four of the indictment; (2) greater particularity concerning the conspiracy, including a "description of any overt act taken by each of the four defendants prior to June 19, 2018," "the identity of all persons the government claims to have been co-conspirators," and the "approximate date of any conversations between any of the four defendants and any purported co-conspirators that preceded June 19, 2018;" and (3) the time and place where the defendant is alleged to have committed the murder and the factual basis for the government's allegation that defendant committed the murder. *See* ECF 79 at 2-3. The information the defendant seeks is not subject to disclosure through a motion for a bill or particulars and his motion should be denied.

A.    Background

The superseding indictment charges Defendant Brown with the following offenses: (1) Count One—Kidnaping Resulting in Death, in violation of 18 U.S.C. § 1201(a)(1); (2) Count Two-- Conspiracy to Commit Kidnaping, in violation of 18 U.S.C. § 1201(c); (3) Count Four—First Degree Murder (Premediated) While Armed, in violation of D.C. Code §§ 22-2101, 4502, 2104.01(b)(1), and 1805; and (4) Count Five—First Degree Murder (Felony Murder) While Armed, in violation of D.C. Code §§ 22-2101, 4502, 2104.01(b)(1), and 1805.[4]  Between the time of the defendant's arrest in this case in late June 2018 and the present, the government has provided voluminous discovery to the defendants in this case, including police reports, crime scene reports, crime scene photographs, video surveillance footage from locations pertinent to the investigation, search warrants containing detailed descriptions of the evidence of the offenses, reports from forensic testing conducted in this case, historical cell site data and phone records for the cellular telephones linked to the defendant and his co-defendants that identifies dates, times, and locations, data from digital devices linked to the defendant and his co-defendants, and disclosures of potential *Brady* material.  Furthermore, count two of the superseding indictment, which charges Conspiracy to Commit Kidnaping, lists multiple overt acts committed by the defendant and his co-conspirators, which also include the dates and locations of these overt acts.  The government has also provided a detailed description in its motion to admit other crimes evidence pursuant to Federal Rule of Evidence 404(b) [ECF 70], of evidence establishing the criminal relationship between the defendant and his co-defendants in the days and weeks prior to June 19, 2018.  This motion includes a description of several incidents in May of 2018, where the defendants targeted the victim

---

[4]  Defendant Brown is not charged in Count Three of the Superseding Indictment, which charges violation of 18 U.S.C. § 924(c).

and his associates for robberies. The government's 404(b) motion further includes a detailed description of the relevance of evidence previously turned over to the defendants in this case that related to these incidents in May of 2018, including cell site data, phone records, and police reports.

B. Argument

Rule 7 of the Federal Rules of Criminal Procedure authorizes the Court to order the government to file a bill of particulars. Fed R. Crim. P. 7(f). The purpose of a bill of particulars is "to ensure that the charges brought against a defendant are stated with enough precision to allow the defendant to understand the charges, prepare a defense, and perhaps also to be protected against retrial on the same charges." *United States v. Butler*, 822 F.2d 1191, 1193 (D.C. Cir. 1987); *United States v. Esquivel*, 755 F. Supp. 434, 436 (D.D.C. 1987). As the courts have repeatedly recognized, "[a] bill of particulars properly includes clarification of the indictment, not the Government's proof of its case." *United States v. Palfrey,* 499 F. Supp. 2d 34, 51 (D.D.C. 2007) (citing *United States v. Hsia*, 24 F. Supp. 2d 14, 30 (D.D.C. 1998)). The government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which a defendant committed the crime charged, or to give a preview of its evidence. *See United States v. Torres*, 901 F.2d 205, 233-34 (2d Cir. 1990) ("[a]cquisition of evidentiary detail is not a function of a bill of particulars"), *cert. denied*, 498 U.S. 906 (1990); *United States v. Armocida*, 515 F.2d 49, 54 (3d Cir. 1975) (bill of particulars is not intended as a vehicle for "wholesale discovery of the Government's evidence"), *cert. denied*, 423 U.S. 858 (1975). Nor should the Court compel a bill of particulars to force the government to reveal a theory of its case that the defense could then use to limit the government's presentation of proof at trial. *Torres,* 901 F.2d at 234; *United States v. Burgin*, 621 F.2d 1352, 1359 (5th Cir.), *cert. denied*, 449 U.S. 1015 (1980).

The constitutional right supporting a bill of particulars request is simply the right to know the offense with which a defendant is charged, not to know the details of how it will be proved.[5] *United States v. Kendall*, 665 F.2d 126, 135 (7th Cir. 1981), *cert. denied*, 455 U.S. 1021 (1982). Especially in conspiracy cases, courts have routinely ruled that defendants do not need detailed evidence about the conspiracy in order to prepare adequately for trial. *See e.g.*, *United States v. Jimenez*, 824 F. Supp. 351, 363-64 (S.D.N.Y. 1993). For example, courts have consistently held that the government is under no obligation to file a bill of particulars detailing facts regarding the existence and formation of the conspiracy. *United States v. Rosenthal*, 793 F.2d 1214, 1227 (11th Cir. 1986); *United States v. Deaton*, 448 F. Supp. 532, 537 (N.D. Ohio 1978). Nor is the government required to specify every overt act of the conspiracy that it intends to prove at trial, *see e.g.* *Wong Tai v. United States*, 273 U.S. 77 (1926); *United States v. Trie*, 21 F. Supp. 2d 7, 23 (D.D.C. 1998); *United States v. Carroll*, 510 F.2d 507, 509 (2d Cir. 1975), or to disclose exact times and locations of acts committed in furtherance of the conspiracy. *United States v. Long*, 449 F.2d 288, 294-95 (8th Cir. 1971). In denying the defendants' motion for a bill of particulars in a conspiracy case, the United States District Court for the District of Columbia reaffirmed the principle that "[i]t is not the function of a bill of particulars to provide a detailed disclosure of the government's evidence in advance of trial." *United States v. Edelin*, 128 F. Supp. 2d 23, 37 (D.D.C. 2001) (quoting *Overton v. United States*, 403 F.2d 444, 446 (5th Cir. 1968)).[6]

---

[5] To be certain, a defendant possesses no right to a bill of particulars and the decision on the motion lie within the discretion of the court. *United States v. Burgin*, 621 F.2d 1352 (citing *Will v. U.S.*, 389 U.S.90 (1967)); *U.S. v. Sheriff*, 546 F.2d 604 (5th Cir. 1977).

[6] *Cf. United States v. Chalmers*, 410 F. Supp. 2d 278, 286-287 (S.D.N.Y. 2006) (Where the government had already provided extensive discovery, and where disclosure of the names of unindicted coconspirators could harm the government's investigation, a motion for a bill of particulars was denied); *United States v. Kinsella*, 380 F. Supp. 2d 7, 10 (D. Me. 2005) (Where the government had made full discovery, including *Brady* material, that outlined the general nature of

Defendant Brown's motion appears calculated to obtain that which the courts have repeatedly held may not be obtained through a bill of particulars, including "a description of any overt act taken by each of the four defendants," and "the approximate date of any conversations between any of the four defendants and purported co-conspirators," *see Wong Tai v. United States*, 273 U.S. 77; *United States v. Trie*, 21 F. Supp. 2d at 23; *United States v. Carroll*, 510 F.2d at 509, *supra,* and "the identities of all persons the government claims to have been co-conspirators," *see United States v. Chalmers*, 410 F. Supp. 2d 278, 286-287 (S.D.N.Y. 2006).

Here, the detailed allegations against Defendant Brown and his co-defendants in the superseding indictment provide more than adequate information to allow him to prepare for trial without fear of surprise and far more than is required under the law.  Furthermore, the government has provided the defense with voluminous discovery in this case, which has further assisted the defendant in preparing for trial, as well as detailed briefing setting forth other 404(b) evidence. Accordingly, there is no reasonable basis for the additional disclosures through a motion for a bill of particulars.  *See, e.g.*, *Butler*, 822 F.2d at 1193 (where the indictment is sufficiently specific or if the requested information is available in some other form, a bill of particulars is not required); *United States v. Glecier*, 923 F.2d 496, 502 (7th Cir. 1991) (demand for a bill of particulars was denied where indictment and government's pretrial disclosures provided defendants with sufficient

---

the evidence that was likely to be presented at trial, the motion for a bill of particulars regarding the conspiracy and drug possession charges was denied); *United States v. Cuong Gia Le*, 310 F. Supp. 2d 763, 781 (E.D. Va. 2004) (When conspiracy defendants were made aware of the identity of the alleged victims and the specific dates and locations of the alleged offenses through a combination of indictment and discovery, no bill of particulars was required); *United States v. Diaz*, 303 F. Supp. 2d 84, 89 (D. Conn. 2004) ("The general rule in conspiracy cases is that the defendant is not entitled to obtain detailed information about the conspiracy in a bill of particulars); *United States v. Walker*, 922 F. Supp. 732, 739 (N.D.N.Y. 1996) (Details regarding how and when a conspiracy was formed, or when each participant entered it, need not be revealed by prosecution before trial; detailed evidence of a conspiracy is generally unavailable to defendants through a bill of particulars, and overt acts in furtherance of a conspiracy need not be disclosed).

information concerning the charges against them), *cert. denied*, 502 U.S. 810 (1991); *United States v. Marrero*, 904 F.2d 251, 258 (5th Cir. 1990) ("when the information requested is provided in some other form, no bill of particulars is required"), *cert. denied*, 498 U.S. 1000 (1990). The defendant relies on *United States v. Anderson,* 441 F. Supp. 2d 15, 19 (D.D.C. 2006), for the proposition that a bill of particulars is required despite the disclosure of voluminous discovery by the government. However, the holding in *Anderson,* particularly when viewed in the broader context of the legal authority addressing requests for a bill of particulars cited *supra,* appears to be confined to the facts of that particular case, which involved a prosecution for obstructing justice through the making of false statements.[7]

In light of the limitations on the proper scope of bills of particulars established by the extensive legal authority cited *supra,* and the information already provided to defense counsel in this case through both the detailed superseding indictment and voluminous discovery, the government submits that it should not be required to file a bill of particulars.

Wherefore, the government submits that Defendant Brown's motion for a bill of particulars should be denied.

---

[7] Defendant also relies on *Carrado v. United States,* 210 F.2d 712, 719 (D.C. Cir. 1954), to support his request that the government be ordered to file a bill of particulars identifying which defendants are charged as principals and which are charged as aiders and abettors. ECF 79 at 2, n.1. The opinion in *Carrado* provides no information about the basis for the trial court's order requiring the government to file a bill or particulars stating which defendants were charged as principals and which were charged as aiders and abettors. In addition, the *Carrado* decision did not address the issue of the propriety of the trial court's order requiring the government to file a bill of particulars, but rather whether the order to file a bill of particulars constituted "an election by the United States Attorney as to which theory he would pursue." *Id.* at 720. Further, the decision by the trial court in *Carrado* to order the government to file such a bill of particulars would seem to be at odds with the extensive legal authority decided subsequent to that case. *See Torres,* 901 F.2d at 234; *United States v. Burgin*, 621 F.2d at 1359 cited *supra.*

## IV.    RESPONSE TO DEFENDANT TAYLOR'S MOTION *IN LIMINE* TO EXCLUDE STATEMENTS OF CO-DEFENDANTS [ECF 89-1]

Defendant Taylor moves this Court to exclude statements of his co-defendants on the ground that there is insufficient evidence to prove that that he was a member of the conspiracy to kidnap and murder the victim, Andre Simmons, Jr.  Although not styled as such, the defendant appears to be requesting the Court to conduct a pretrial hearing to require the government to prove: (1) the existence of a conspiracy; and (2) that Defendant Taylor was a member of the conspiracy prior to admission of any statements against him pursuant to Fed. R. Evid. 801(d)(2)(E).  As discussed in detail *infra,* the legal authority in this Circuit does not require the government, prior to trial, to prove up the conspiracy or a defendant's participation in it, nor does this Circuit require the Court to conduct a "mini-trial" to establish the existence of a conspiracy prior to the admission of co-conspirator statements.[8]  The defendant's motion should be denied.  While the government will seek to elicit statements under the rule permitting the admission of co-conspirator statements,

---

[8]  The government anticipates presenting at trial strong evidence establishing the defendant's knowing and voluntary participation in the conspiracy, including substantial evidence that the defendant possessed the cellular telephone used to make the ransom calls to the victim's family during the time period after the victim was kidnapped and before he was murdered.  Additionally, there is video footage capturing Defendant Taylor with his co-conspirators and the Maxima at the Lucky Mart at approximately 7:11 a.m. (less than an hour after the murder).

The defendant also misstates in his motion the evidence establishing his participation in the conspiracy, including evidence of his link to the ransom phone.  For example, the defendant incorrectly asserts that phone records for a phone belonging to the defendant's mother showed that a "19-minute" conversation occurred between the defendant's mother's phone and the ransom phone. ECF 89-1 at 6.  In fact, this was an outgoing call from the defendant's mother's phone to the ransom phone that lasted only 19 *seconds*.  Further, defendant points to no evidence that would lead to his assertion that this call establishes that he was using his mother's phone to call the ransom phone at 4:26 a.m., while the kidnapping was ongoing.  *Id.*  The evidence at trial will include testimony of a witness who communicated with Taylor during the course of the abduction, on the random phone.  There is no evidence that Taylor was using his mother's phone during or after the abduction.

there is no basis for the Court to conduct a hearing prior to the trial to determine whether such testimony may be admitted.

Federal Rule of Evidence 801(d)(2)(E) provides that statements of co-conspirators made in furtherance of the conspiracy are not hearsay. A statement made by a co-conspirator in furtherance of the conspiracy is admissible against all co-conspirators. *United States v. (Joseph) Jackson*, 627 F.2d 1198, 1216 (D.C. Cir. 1980). To admit such statements, the government need only prove by a preponderance of the evidence that a conspiracy existed between the defendant and the declarant and that the statement was made in furtherance of the conspiracy. *United States v. Beckham*, 968 F.2d 47, 51-52 (D.C. Cir 1992) (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)).

The District of Columbia Circuit additionally requires that there be independent evidence of the conspiracy apart from the statement, although the content of the statement itself can also be considered in determining whether such independent evidence exists. *United States v. Gewin,* 471 F.3d 197, 201 (D.C. Cir. 2006); *United States v. Gatling,* 96 F.3d 1511, 1520 (D.C. Cir. 1995); *United States v. Beckham,* 968 F.2d 47, 50-51(D.C. Cir. 1992); *United States v. Washington,* 952 F.2d 1402, 1407(1991), *cert. denied,* 503 U.S. 1009(1992).[9]

The D.C. Circuit has made clear that the exigencies of trial will typically make determining the existence of a conspiracy prior to the admission of co-conspirators' statements impractical:

---

[9] Some examples of such statements include statements that enhance a co-conspirator's usefulness to the conspiracy, statements that invite participation in further stakes of the conspiracy, statements that keep a co-conspirator informed about the progress of the conspiracy, and statements that motivate a co-conspirator to continue to participate and provide background information on key members of the conspiracy. *United States v. Carson,* 455 F.3d 336, 366-67 (D.C. Cir. 2006) (quoting *United States v. Edmond,* 52 F.3d 1080, 1110-11 (D.C. Cir. 1995)). *See United States v. Tarantino,* 846 F.2d 1384, 1412 (D.C. Cir. 1988).

> Given the myriad of difficulties that surround the availability of witnesses, it is just impractical in many cases for a court to comply strictly with the preferred order of proof by taking the testimony of such witnesses piecemeal, waiting until a conspiracy is fully proved by independent evidence, and then recalling from their normal pursuits, those who testify to hearsay declarations of co-conspirators. As a concession to such practical impediments that arise during trial, the court is vested with considerable discretion to admit particular items of evidence subject to connection.

*Jackson*, 627 F.2d at 1218 (internal citations omitted). In *United States v. White*, 116 F.3d 903 (D.C. Cir. 1997) (citations omitted)*,* the D.C. Circuit clarified its earlier holding in *Jackson*, stating, "Although in *Jackson* we said that 'the better practice' was to secure proof of the conspiracy adequate to sustain admission of the hearsay before the hearsay itself was received, we made clear that trial exigencies would often make that impracticable and endorsed the traditional 'subject to connection' approach." *Id*. at 915.

When confronted with this issue, trial courts in this Circuit have rejected such motions from defendants for what in essence amounts to a request for a mini-trial. *See United States v. Apodaca,* 275 F. Supp. 3d 123, 138 (D.D.C. 2017) (noting that much of the same evidence and witnesses to establish the existence of the conspiracy would also be presented to prove up the co-conspirator statements, and that "requiring witnesses to testify twice, first at a pretrial hearing and second at the trial itself would result in duplicative testimony, allow defense counsel two bites at the apple to cross-examine the cooperating witnesses… and raise a significant concern about the safety of cooperating witnesses and their families."); *United States v. Edelin,* 128 F. Supp. 2d 23, 45-46 (D.D.C. 2001) (holding that a "hearing to make an advanced determination of conspiracy is unnecessary for the Court's determination by a preponderance of evidence that a conspiracy existed."); *United States v. Hin-Yung,* 97 F. Supp. 2d 24, 37 (D.D.C. 2000) (where the Court, relying upon *Jackson, supra,* denied defendant's motion for pre-determination and allowed the government to prove admissibility at trial "subject to connection."); *accord, United States v.*

*Cooper,* 91 F. Supp. 2d 60, 78 (D.D.C. 2000) (where the Court, relying upon *United States v. Gantt,* 617 F.2d 831, 845 (D.C. Cir. 1980), declined to conduct a pre-trial hearing and instead ruled that it would instruct the jury to disregard hearsay statements if a substantial connection has not been produced by the close of the government's case).

Moreover, the D.C. Circuit has routinely upheld the practice of deferring the determination of such a defense motion until the trial ends, if that motion requires "deciding issues of fact that are inevitably bound up with evidence about the alleged offense itself." *United States v. Wilson*, 26 F.3d 142, 159 (D.C. Cir. 1994). In *Gantt*, *supra* at 845, the D.C. Circuit upheld the trial court's refusal to hold a pretrial hearing into the existence of a conspiracy so as to determine admissibility of statements under co-conspirators' statements exception to the hearsay rule. The Court explained that "[a]s a practical matter, to avoid what otherwise would become a separate trial on the issue of admissibility, the court may admit declarations of co-conspirators 'subject to connection.'" *Id.*; *see also (Joseph) Jackson supra,* 627 F.2d at 1218 (trial courts are not required to hold "mini-trials" on the conspiracy issue before the conditional admission of a co-conspirator's statements).

In light of these considerations, the Court should reject the defendant's request for a pretrial hearing relating to co-conspirator statements. To determine pretrial whether particular statements meet the elements for the admission of co-conspirator statements, the Court would essentially have to conduct a trial before the trial. Rule 801(d)(2)(E) requires the government to prove both that the conspiracy exists and that the statement was made in furtherance of the conspiracy. A significant portion of the government's evidence at trial will be presented to prove the existence of the conspiracy to kidnap the victim. It would be an enormous waste of judicial resources to present this evidence twice in order to resolve the question of co-conspirator statements in advance

of trial.  Neither the federal rules nor precedent in this Circuit require that the Court undertake such an exercise.

Wherefore, the government submits that the defendant's motion to exclude statements of co-defendants be denied.

## V.    RESPONSE TO DEFENDANT TAYLOR'S MOTION TO SUPPRESS EVIDENCE OF OUT-OF-COURT IDENTIFICATION [ECF 99]

### A.    Background

During the course of the investigation into the charged abduction and homicide of Andre Simmons, law enforcement learned of efforts made by the defendants to target Simmons and his associates for armed robberies in the weeks leading up to the June 19, 2018, abduction.  Specifically, on May 21, 2018, less than one month before the charged kidnapping, an armed home invasion took place at a residence where Simmons and his friends frequented in the 1800 block of Peachtree Lane, Bowie, Maryland.  The facts and circumstances of that offense were previously detailed in the government's Motion to Admit Other Crimes Evidence Pursuant to Federal Rule of Evidence 404(b) [ECF No. 70].

Defendant Taylor moves to suppress an identification made by one of the civilian witnesses who was present during the armed home invasion.  The facts and circumstances of that identification are as follows.  During the course of the investigation, law enforcement reached out to a number of friends and associates of Simmons.  In an interview with one of Simmons's close friends, the witness advised that he, Simmons, and other friends frequented a house on 1800 Peachtree Lane.  The witness advised that he had been present during an armed home invasion at the residence on Peachtree Lane in the weeks leading up to the abduction and murder of Simmons. The witness estimated that the armed home invasion occurred about three to four weeks prior to the offenses charged in this case.  The witness advised that after the Peachtree incident, his close

friends were victimized in several armed offenses.

The witness advised that at the time of the home invasion, he and another close associate of Simmons were at the house.  According to the witness, Simmons had been at the house shortly before the home invasion, but had left with another friend shortly before the four intruders entered. The witness stated that out of nowhere, four masked individuals entered the residence through the basement.  The four intruders pointed weapons at the witness and his friend and began robbing the two occupants of the house.  The witness noted that the robbery seemed strange, as if the robbers had "another agenda" and they were "looking for something else."  The witness later described the suspects asking them "where's the shit at," as if they were looking for something specific (and not merely robbing the witness and his friend).

The witness recalled that some of the guns had green laser sights.  Of the four intruders, the witness recalled one of the intruders standing out based on his build and physique.  The witness noted that the biggest guy stood out because he was so big and his gun was so small.  The witness further described the biggest individual as having a build that resembled an offensive lineman, who was "tall and chubby."  Although the biggest suspect was wearing a mask, the witness described him as having shoulder length dreadlocks coming from under the mask.  With respect to the other three perpetrators, the witness described that the shortest perpetrator actually took of his mask.  The witness stated that he had brown skin, a goatee, and dreadlocks.

The witness advised that after Simmons was killed, another associate had pulled up an article or something on the internet/social media to show the witness the individuals who had been arrested with respect to Simmons's murder.  When the witness was shown a picture of the largest of the individuals who had been arrested for Simmons's murder, the witness recognized the individual as the heavy-set suspect from the Peachtree Lane incident.  The witness noted that even

though the heavy-set suspect had been wearing a mask that partially obscured his face, he "could still point him out of a lineup" due to his body/physique that was "so distinct that mask on, mask off, you knew who it was."

The witness advised that he also was shown a picture of the individual who he previously described as taking off his mask during the Peachtree Lane incident. The witness stated that he was 100% certain that the two individuals had participated in the Peachtree Lane home-invasion. The witness advised that he had heard nicknames associated with the two individuals who he recognized in the photos; he stated that "Booby" (Brown) was the shorter suspect with dreadlocks who took off his mask, and "Butter" or "Butta" (Taylor) was the heavy-set, dark-skinned guy with dreadlocks, with the "football-style" build. The witness advised that when he was shown photos of the individuals who had been arrested for the murder of his friend, he was shown them in the context of "these are the guys from Andre's situation, and his reaction was "I've seen these guys before, this [Peachtree] is where I've seen them at."

Law enforcement was not present and did not participate in the identification of Taylor and Brown by the witness who was present during the Peachtree Lane home invasion.

B.    Argument

Defendant Taylor contends that the out-of-court identification by a civilian witness should be suppressed because it is "impermissibly suggestive" and is not reliable under the totality of circumstances. Motion to Suppress (ECF No. 99) at 2. In so arguing, he attempts to import a line of case law that pertains to identification procedures that are arranged by law enforcement officers.[10] In *Perry v. New Hampshire*, 565 U.S. 228 (2012), however, the Supreme Court squarely

---

[10] Where law enforcement is involved in the suggestive identification procedure at issue, a two-part test is applied to determine, first, if the identification procedure was unduly suggestive and unnecessary; and second, whether under the totality of circumstances the identification was

rejected applying this framework where law enforcement officers had no involvement in the

identification procedure:

> We have not extended pretrial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers. Petitioner requests that we do so because of the grave risk that mistaken identification will yield a miscarriage of justice. Our decisions, however, turn on the presence of state action and aim to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array. When no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.

*Id.* at 232-33.

In *United States v. Hinckley*, No. 2012 WL 386637 (D.D.C. Jan. 13, 2012), Judge Friedman

applied *Perry* to a challenge brought by the defendant regarding an eyewitness identification:

> the initial eyewitness identification made by the witness was not the result of any identification procedure organized by police or law enforcement officers. As the Supreme Court has made clear in the past and underscored in its decision earlier this week, there is no basis to suppress the eyewitness identification of a witness, even if the identification was made under arguably suggestive circumstances, so long as there was no police conduct in arranging the identification. *Perry v. New Hampshire*, No. 10-8974, slip op. at 10–14. Furthermore, as the Supreme Court also held in *Perry*, the Due Process Clause does not require a preliminary assessment by a court of the reliability of an eyewitness identification if the identification procedure was not arranged by the police. *Id.* at 2, 15–18.
> …

---

nevertheless reliable. *See e.g.*, *Manson v. Brathwaite*, 432 U.S. 98, 107-109 (1977); *see also Perry*, 565 U.S. at 232 ("An identification infected by improper police influence, our case law holds, is not automatically excluded. Instead, the trial judge must screen the evidence for reliability pretrial. If there is 'a very substantial likelihood of irreparable misidentification,' *Simmons v. United States*, 390 U.S. 377, 384 (1968), the judge must disallow presentation of the evidence at trial. But if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth."

> Counsel for Mr. Hinckley raise facts and circumstances that suggest that the witness' identification nevertheless may not be reliable or that his proffered testimony should not be credited. The Supreme Court has said, however, that, in the absence of a due process violation, there is no need for a preliminary assessment of reliability or credibility. *See Perry v. New Hampshire*, No. 10–8974, slip op. at 2, 15–18.

*Id.* at *1; *see also United States v. Elliot*, 732 F.3d 1307, 1310 (11th Cir. 2013) (relying upon *Perry* and noting, "[t]hus, when no improper law enforcement activity is involved, exclusion of an eyewitness identification is unnecessary."); *Garcia v. Ryan*, No. 15-cv-00025 (PHX)(DGC), 2018 WL 4679644, at *19 (D. Ariz. Sept. 28, 2018) (applying *Perry* and reasoning, "If a court concludes, … that the state was not responsible for errors in the identification procedure, it need not address whether the identification must be suppressed;" the Court expressly rejected defendant's argument that even where there was no state action, the court should nonetheless have evaluated the reliability of the identification under *Neil v. Biggers*, 409 U.S. 188, 198 (1972), because, the Court reasoned, "doing so would have been inconsistent with *Perry*.").

Here, there was no state action of any sort in the civilian's identification of Defendants Taylor and Brown in the Peachtree Lane armed home invasion. To the extent the defendants seek to argue that the civilian's identification is unreliable, they may raise such challenges in the manner described by the Supreme Court in *Perry* (such as employing "vigorous cross-examination," and arguing "jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt").[11]

The identification by the civilian after seeing social media/a news article about the suspects

---

[11] In *Perry*, the Supreme Court emphasized that the Constitution "protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." *Id.* at 237; *see also United States v. Melvin*, 730 F.3d 29, 34 (1st Cir. 2013) ("Jurors should not be treated as gullible dupes, and ... identification evidence should be withheld from them only in extraordinary cases." (citations omitted)).

is no different than an identification examined by the Sixth Circuit in *Anderson v. Campbell*, 2017 WL 9249948 (6th Cir. Oct. 25, 2017). In that case, the suspect's ex-girlfriend contacted the robbery victim and gave the victim the suspect's name. With that information, the robbery victim then looked at pictures of the suspect on Facebook, identified the suspect he viewed on social media as one of the robbers, and relayed that identification to the police to report that the person he had been directed to by the suspect's girlfriend was the person who had robbed him. Applying Perry, the Sixth Circuit noted that "[the girlfriend] is not a law enforcement officer, and the undue-suggestiveness framework does not apply."[12]  *Id.* at *3; *see also Howard v. Warden, Lebanon Corr. Inst.*, 519 F. App'x 360, 368 (6th Cir. 2013) (applying *Perry* and rejecting argument that identification was unduly suggestive where facts arguably indicated that the identifying witness was predisposed to identify the suspect based on information conveyed to him from a biased witness and news coverage of the suspect [or, worse, intentionally planned to identify the suspect to avenge his brother-in-law's death], as actions of police did not result in suggestivity of identification procedure); *United States v. Zeiler*, 470 F.2d 717, 720 (3d Cir. 1972) (concluding that the broad publication of mugshots in news sources is not a state-arranged identification procedure); *United States v. Jones*, No. 16-cr-516 (KM), 2017 WL 752830, at *5 (D.N.J. Feb. 27, 2017) (applying *Perry* and noting that "the police did not set up any identification procedure,

---

[12] Even where the suspect's name is provided to the witness by law enforcement – rather than by a civilian witness – courts have nonetheless found that the witness's efforts to investigate the suspect online did not result in an unduly suggestive identification. *See, e.g.*, *United States v. Murphy*, No. 17-cr-131, 2018 WL 6503502, at *7 (E.D. Tenn. Dec. 11, 2018) (applying *Perry* analysis and finding no state involvement even where law enforcement provided name of suspect to witness who then independently researched the suspect: "On the other hand, it was [the witness], operating solely under his own volition, who took it upon himself to personally access a computer to search Defendant's name and find a privately-operated, news-owned website that had independently chosen to upload and display Defendant's most recent mugshot.

suggestive or otherwise.  Rather, the witnesses, upon learning that Mr. Jones had been charged, went online and did their own research. That may well furnish a basis for cross-examination, weaken their testimony in the eyes of the jury, or lay the foundation for expert testimony on the factors that may render eyewitness identifications unreliable.  It does not trigger the *Neil/Manson* due process remedy of a pretrial hearing and suppression."); *United States v. Pierce*, No. 11-cr-08(WKW), 2012 WL 1030465, at *3 (M.D. Ala. Mar. 9, 2012), report and recommendation adopted, No. 11-vt-8-WKW, 2012 WL 1021839 (M.D. Ala. Mar. 27, 2012) ("the allegedly suggestive circumstances were created by the victims' private, independent investigation, and not by law enforcement.  Thus, the court concludes that because there was nothing suggestive in the photo array, and any taint of suggestiveness caused by the victims' independent investigation was not due to action by the police, the court does not need to consider the reliability question.); *United States v. Volpe*, 42 F. Supp. 2d 204 (E.D.N.Y. 1999) (identifying witness's exposure to photographs of the suspects that had been released to media images prior to the identification went to the weight of the identification evidence rather than its admissibility); *see also* Ann K. Wooster, Release of Criminal Defendant's Photograph to Media as Factor in Determination of Whether Circumstances of Witness's Identification of Defendant in Photographic Array Shown by Police to Witness Were Impermissibly Suggestive as Matter of Federal Constitutional Law, 23 A.L.R. 7th Art. 7 (2017).

Wherefore, the government respectfully requests that the Court deny Defendant Taylor's Motion to Suppress the Out-of-Court Identification that lacked any involvement by law enforcement.

## VI.    RESPONSE TO DEFENDANT SWEENEY AND DEFENDANT TAYLOR'S MOTIONS TO SEVER DEFENDANTS [ECF 77, 98]

### A.    Argument

The indictment charges the defendants for their participation in a conspiracy to kidnap Andre Simmons that ultimately resulted in Simmons's murder, in the early morning hours of June 20, 2018.  There is a presumption in favor of trying members of a conspiracy who have been indicted together, even where each member of the conspiracy may have varying levels of participation, or where the types of evidence may differ for each member of the conspiracy. Moreover, because the evidence would be admissible even in separate trials, the judicial efficiencies of trying the case one time – rather than four separate times – where the evidence would be duplicative, weighs strongly in favor of a joint trial.  For the reasons detailed below, the disparities in evidence or risks of confusion by the jury are minimal and can be more appropriately addressed through instructions to the jury.  Accordingly, defendants' motions to sever should be denied, for the reasons detailed below.

### 1.    Defendants are Properly Joined

In co-defendant cases, Federal Rule of Criminal Procedure 8(b) controls joinder of both offenses and defendants.[13]  *United States v. Perry*, 731 F.2d 985, 989 (D.C. Cir. 1984); *United States v. Jackson*, 562 F.2d 789, 793-94 (D.C. Cir. 1977); *United States v. Wilson*, 26 F.3d 142, 153 n. 4 (D.C. Cir. 1994) ("In cases involving multiple defendants, the weight of authority in this circuit and elsewhere regards Rule 8(b) as providing the sole standard for determining the permissibility of joinder of offenses." (internal quotation marks omitted)).  This Circuit construes Rule 8(b) broadly in favor of joinder.  *United States v. Nicely*, 922 F.2d 850, 853 (D.C. Cir. 1991)

---

[13] Rule 8(a) has "no application" to the analysis of the issue of joinder of offenses in cases involving multiple defendants.  *United States v. Brown*, 16 F.3d 423, 427 (D.C. Cir. 1994).

("[T]his circuit's law makes it difficult to prevail on a claim that there has been a misjoinder under Rule 8(b)").

Rule 8(b) directs that "[t]wo or more defendants may be charged in the same indictment . . . if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed R. Crim P. 8(b). The District of Columbia Circuit has held that acts or transactions form a "series" within the meaning of Rule 8(b) if they "are connected together or constitut[e] part of a common scheme or plan." *Perry*, 731 F.2d at 990 (internal quotation marks and citations omitted). The touchstone for analysis under Rule 8(b) is whether there is "a logical relationship between the acts or transactions within the series." *Nicely*, 922 F.2d at 853. Rule 8(b) requires only that the government 'allege,' not prove, the facts necessary to sustain joinder." *United States v. Halliman*, 923 F.2d 873, 883 (D.C. Cir. 1991) (citations omitted).[14] In determining the propriety of joinder, "this circuit permits a trial court to consult the indictment as well as any other pretrial evidence offered by the Government." *United States v. Spriggs*, 102 F.3d 1245, 1255 (D.C. Cir. 1997) (quoting *United States v. Wilson*, 26 F.3d 142, 153 (D.C. Cir. 1994)).

Although there are limits to what can be charged in a single indictment, this Circuit has cautioned that it is "difficult to prevail on a claim that there has been misjoinder under Rule 8(b)" *Nicely*, 922 F.2d at 853. Under Rule 8(b), "[t]here must be a logical relationship between the acts or transactions within the series." *Id*. (citing *United States v. Perry*, 731 F.2d 985, 990 (D.C. Cir. 1984)). Furthermore, joinder under Rule 8(b) will ordinarily be permitted where the government

---

[14] This low burden is consistent with the favor accorded the efficiency of joint trials and with the trial's court's ability to grant severance at a later time if it becomes clear that the basis for joinder is missing and that the defendant would be prejudiced. *See United States v. Jackson*, 562 F.2d 789, 796-97 (D.C. Cir. 1977).

alleges a conspiracy in good faith. *See United States v. Nerlinger*, 862 F.2d 967, 972 (2d Cir. 1988) (collecting cases and noting that "[t]he established rule is that a non-frivolous conspiracy charge is sufficient to support joinder under Fed. R. Crim. P. 8(b)."); *United States v. Hattaway*, 740 F.2d 1419, 1424 (7th Cir. 1984) (same); *United States v. Arruda*, 715 F.2d 671, 678 (1st Cir. 1983) (same).

Here, all four defendants are charged in four of the five counts in the indictment (Defendant Brown is charged in each count, with the exception of Count 3). All counts pertain to the same nexus of facts: the abduction and murder of Andre Simmons. Courts have consistently held that all defendants need not be charged together in each and every count of an indictment for charges to be properly joined. *See, e.g.*, *United States v. Grey Bear*, 863 F.2d 572, 583 (8th Cir. 1988) (finding joinder proper in counts that did not involve all defendants where charges required joint proof, even though certain charges were limited to certain defendants); *United States v. Martinez*, 479 F.2d 824, 828 (8th Cir. 1973) (affirming joinder where reviewing overlapping evidence of multiple offenses, where defendant was charged in only one count of multi-count indictment); *Perry*, 731 F.2d at 991-92 (joinder was appropriate where one co-defendant was charged in count one of indictment, and both co-defendants were charged in count two). While Rule 8(b) requires all of the charged acts to be part of the same "series of acts or transactions," "it is not necessary that each defendant have participated in each act or transaction of the series." *United States v. Andrade*, 788 F.2d 521, 529 (8th Cir. 1986); *see also United States v. Scott*, 413 F.2d 932, 935 (7th Cir. 1969) ("It must only be shown that each act or transaction was part of a *series* of acts or transactions and that *each defendant participated in the series* of transactions") (emphasis added).

Even when joinder of defendants and offenses is proper under Rule 8(b), Federal Rule of Criminal Procedure 14(a) permits a court to sever defendants or counts, or "provide any other relief

that justice requires," if the joinder "appears to prejudice a defendant or the government." Fed. R.

Crim. P. 14(a).  The decision to sever falls within the discretion of the trial court, and the balance

is to be "struck in favor of joint trials."  *United States v. Bruner*, 657 F.2d 1278, 1298-90 (D.C.

Cir. 1981) (quoting *United States v. Hines*, 455 F.2d 1317, 1334 (D.C. Cir. 1972)).  Rule 14 even

countenances some prejudice to a defendant from a joint trial, and severance is not required simply

because a defendant might have a better chance of acquittal if tried separately.  *Zafiro v. United

States*, 506 U.S. 534, 540 (1993); *see also Halliman*, 923 F.2d at 884; *United States v. Wright*, 783

F.2d 1091, 1095 (D.C. Cir. 1986).  Instead, "a district court should grant a severance under Rule

14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of

the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."

*Zafiro*, 506 U.S. at 539.  As examples of serious risk, the Supreme Court cited circumstances where

essential exculpatory evidence that would be available to a defendant tried alone were unavailable

in a joint trial, where many defendants with markedly different degrees of culpability are tried

together in a complex case, and where highly prejudicial evidence that is probative of a defendant's

guilt is only technically admissible against a codefendant.  *Id.*

### 2.   Defendants Indicted in Conspiracy Together Should be Tried Together

As the Fourth Circuit explained in *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996):

> The basic rule is that persons who have been indicted together, particularly
> for conspiracy, should be tried together. Once the scope of that conspiracy
> is established, one's having come late to or having varied his level of
> participation in it from time to time puts him in a position "no different from
> that of any co-conspirator who claims to be prejudiced by evidence that goes
> to the activities of co-conspirators."  The Government may not properly be
> "deprived ... of its right to detail the full scope of the conspiracy and to
> present its case in proper context" simply because particular co-conspirators
> were not involved in the full scope of its activities.

*Id.* at 883; *see also United States v. Franklin*, No. 04-cr-128 (RMC), 2005 WL 8157514, at *12

(D.D.C. Dec. 16, 2005) (relying on *Tipton* in denying severance in multi defendant conspiracy).

Although issues raised by the defendants with respect to the disparity in quantity and types of evidence will be discussed below, that a particular defendant may have a more significant or a more limited role in the conspiracy does not itself provide a basis for severance in the context of charged conspiracy cases.  As a court in this District noted in *United States v. Gray*, 173 F. Supp. 2d 1 (D.D.C. 2001):[15]

> A showing that there is more evidence against one defendant, that there are more charges against one defendant, or that the evidence is stronger against one defendant than against others is insufficient to prevail on a demand for severance.  *See Blumenthal v. United States*, 332 U.S. 539, 68 (1947); *United States v. Perholtz*, 657 F. Supp. 603 (D.D.C. 1986). In particular, where conspiracy is a dominant element and the Government must prove agreement among several co-defendants, joinder is presumed despite the fact that the evidence may show that some defendants were "kingpins" and others were less active.  *See United States v. Edelin*, 118 F. Supp. 2d 36, 43 (D.D.C. 2000) ("[S]everance is not appropriate merely because some co-conspirators were more active in the conspiracy, nor because some co-conspirators played a more central role.").

*Id*. at 10-11 (emphasis added).

Here, the defendants jointly engaged in the abduction and murder of Andre Simmons.  This is not an instance where one defendant has been charged for isolated conduct at the very fringes of the conspiracy.  *Compare Franklin*, 2005 WL 8157514, at *15 (severing defendant whose only involvement was her presence at a residence where guns and drugs were found on the day that search warrant was executed at conclusion of investigation, but otherwise had no involvement in conspiracy that spanned approximately 7 years; severance denied for all remaining members of conspiracy).  Although Defendant Brown may argue that his role was limited to the collection of

---

[15] *Aff'd sub nom. United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011), *aff'd in part sub nom. Smith v. United States*, 568 U.S. 106 (2013).

ransom money, that role itself is a central part of the kidnapping and would not justify severance.[16]

Because all defendants are charged in the same conspiracy, if trials were severed, the evidence in multiple trials would require near duplicative presentation of evidence. Unnecessary duplication of evidence weighs strongly in favor of denying the defendants' severance motion.

### 3. Alleged Disparities in Evidence and/or Levels of Culpability Does Not Require Severance

This Circuit has continually held that a joint trial is inappropriate only when the party moving for severance shows that the evidence against one defendant is "far more damaging than the evidence against the other defendant." *United States v. Tarantino*, 846 F.2d 1384, 1398 (D.C. Cir. 1980) (emphasis added); *accord Halliman*, 923 F.2d at 884; *United States v. Butler*, 822 F.2d 1191, 1194 (D.C. Cir. 1987). Notably, each defendant here is charged with the conspiracy that culminated in the murder of Andre Simmons; this is not a case where three defendants are charged with murder and the fourth is charged with making a false statement. Compare *United States v. Sampol*, 636 F.2d 621 (D.C. Cir. 1980) (severance granted where one defendant charged with two murders and co-defendant charged with false declarations and misprision of felony).

---

[16] The evidence at trial will show that Defendant Brown had a far more significant role than simply picking up the money drop: he was present with his co-conspirators and the Maxima in Benning Park shortly after the abduction; he was in phone contact with his co-conspirators throughout the course of the abduction, including Defendant Moore calling Defendant Brown for a call lasting just under a minute less than 10 minutes after the victim had been abducted; numerous calls between Brown and Moore shortly after the abduction; a call by Brown to Taylor approximately thirty minutes after the abduction in Maryland; repeated calls between Brown and Taylor as ransom calls are being made from Taylor's phone; lengthy calls between Brown and Sweeney while the victim is being held and ransom calls are being made, including numerous calls lasting well over 20 minutes, and a call at 1:50 a.m. that lasted for more than three hours, which continued through the time that Defendant Brown picked up the ransom money. Additionally, there is evidence that all four defendants met up at Defendant Brown's girlfriend's residence shortly after the murder. Finally, Defendant Brown had connections to the murder weapon and was involved in at least one of the efforts to target the decedent and his friends in the weeks leading up to the murder. Such evidence is a far cry from a *de minimis* role in the conspiracy.

Furthermore, this circuit has stated that, as a general rule, "[a]bsent a dramatic disparity of evidence, any prejudice caused by joinder is best dealt with by instructions to the jury to be given individual consideration to the defendant." *Bruner*, 657 F.2d at 1290; *United States v. Long*, 905 F.2d 1572, 1581 (D.C. Cir. 1990); *Tarantino*, 846 F.2d at 1398; *United States v. Butler*, 822 F.2d at 1194. "The few cases in which [the D.C. Circuit has] overturned a trial court's denial of a motion to sever have involved ***clear disparities*** between the weight, quantity, or type of the evidence against the movant and against the other defendants." *Halliman*, 923 F.2d at 884 (emphasis added). The critical question is "whether a jury could reasonably compartmentalize the evidence introduced against each individual defendant." *Id.*; *see also Franklin*, 2005 WL 8157514, at *13 (noting "critical question" turns on jury's ability to compartmentalize the evidence).

Here, there is no question that a jury could compartmentalize the different types of evidence being introduced against each individual defendant. Although there is some differences in the type of evidence against each defendant, there is significant, overlapping evidence against each of the defendants. The factual discussion above details the evidence in the case, but the chart below provides a summary of the types of evidence that exists for each defendant:

| Type of Evidence | Moore | Brown | Taylor | Sweeney |
|---|---|---|---|---|
| Fingerprint | √ | √ | | |
| DNA | √ | √ | | √ |
| Cell-Site Evidence | √ | √ | √ | √ |
| Phone Records | √ | √ | √ | √ |
| Evidence of Possession of Ransom Phone | √ | | √ | |
| Video Following Offense | √ | √ | √ | √ |
| Evidence of Possession of Murder Weapon | | √ | | √ |
| Evidence of Prior Efforts to Target Decedent | √ | √ | √ | √ |

| Maxima GPS | √ | | | √ |
| Evidence of Phone Contacts Following Murder | √ | √ | | |

As the above-matrix indicates, although each defendant has slightly different types of evidence, there are extensive overlaps in evidence that must be presented together in order to provide the jury with the picture of how the abduction and kidnapping came together. Although there may be no DNA or fingerprints for Defendant Taylor, there is evidence of his possession and use of the ransom phone during the abduction; similarly, although there is no fingerprint evidence for Defendant Sweeney, there is evidence of both he and Defendant Brown having access to the murder weapon. Additionally, there is strong cell-site evidence for all four defendants during the course of the kidnapping – as well as phone records evidencing their contacts throughout the course of the night that will be introduced to establish the coordination between the defendants during the course of the offenses. To the extent a particular type of evidence may not be present (for instance, the lack of fingerprint evidence for Defendants Sweeney and Taylor), defense counsel can point to the absence of such evidence and assist the jury in compartmentalizing the specific type of evidence and how it pertains (or does not pertain) to their particular clients.

Moreover, even were it assumed arguendo that a dramatic disparity of evidence exists and risk of prejudice is high, less drastic measures, such as a limiting instruction, would suffice as a remedy. *Zafiro*, 506 U.S. at 539. Indeed, any prejudice caused by joinder would be cured by instructing the jury to consider separately the evidence implicating each defendant. In the instant matter, the risk of jury confusion is minimal, and any claim that the jury would be unable to follow the Court's instructions to compartmentalize the evidence against each defendant is untenable. At trial, the defendants will be able to clearly delineate the evidence that exists or does not exist as to each defendant and a jury instruction can be provided by the Court to ensure that the jury will

make individual determinations of the defendants' guilt.  Defendant Taylor, for instance, can point

to the lack of forensic evidence in the Maxima, and Defendant Sweeney can likewise point to the

lack of video evidence showing him with members of the conspiracy after the murder.  Similarly,

through instruction, the Court can remind the jury that Count 3 does not apply to Defendant

Brown.[17]  Accordingly, there is little risk that the jury will be unable to discern which evidence

applies to and incriminates which defendant.

### 4.   Defendants Cannot Demonstrate Heavy Burden to Justify Severance

"[I]t is not enough merely to show that separate trials might have provided the defendant a

better shot at acquittal."  *United States v. Berg*, 714 F.3d 490, 496 (7th Cir. 2013).  The defendant

bears the "heavy burden" of establishing that the joint trial "prevent[ed] the jury from arriving at

a reliable judgment as to guilt or innocence."  *Id.*; *see also Zafiro v. United States*, 506 U.S. 534,

539 (1993) ("a serious risk that a joint trial would . . . prevent the jury from making a reliable

judgment about guilt or innocence"); *United States v. Benedict*, 855 F.3d 880, 885 (8th Cir. 2017)

("This trial was not the 'unusual case' in which the efficiency of joinder would have been

outweighed by difficulty for the jury to analyze separately the evidence against each individual

defendant.").

The requisite "heavy burden" of showing prejudice is not satisfied by showing that one

defendant is less culpable than another, or that the defendant would have a better chance of

acquittal in a separate trial, or by a complaints of "spill-over" of damaging evidence presented

---

[17] *See, e.g.*, *United States v. Brodie*, 326 F. Supp. 2d 83, 93 (D.D.C. 2004) (Court found severance of counts not warranted where one defendant had not been charged in second charged conspiracy, noting:  "There is simply no indication that the evidence as to the transactions underlying the Padonu–Kareem conspiracy implicates in any way Brodie, and thus, the jury would have no basis for associating Brodie with the second conspiracy.").  Similarly, where Defendant Brown has not been charged in Count 3, there is no possibility the jury could become confused and convicted him for an offense for which he is not charged.

against a codefendant. *United States v. Morgan*, 748 F.3d 1024 (10th Cir. 2014); *see also United States v. White*, 737 F.3d 1121 (7th Cir. 2013). There is substantial and independent evidence of each defendant's involvement in the charged offenses (as noted in the matrix above): "the disparity of evidence [does] not rise to a level necessary to mandate severance." *See United States v. Moore*, 651 F.3d at 96; *see also Ford*, 155 F. Supp. 3d at 69-70 ("Although some defendants [were] alleged to have committed fewer crimes (no gun or PWID charges, for example) or participated less extensively or played different roles," severance was not justified).

Additionally, the evidence of the conspiracy is inextricably intertwined. Even at a separate trial, the evidence against each of the codefendants would be independently admissible as to each defendant, even if the trials were to be severed. There would be no benefit received to the Court in severing the defendants: there would be multiple trials, costs would be incurred twice, witnesses would be inconvenienced, and additional delays would be imposed in bringing the respective defendants to trial. *See United States v. Celis*, 608 F.3d 818, 844 (D.C. Cir. 2010) (quoting *United States v. Mardian*, 546 F.2d 973, 979 (D.C. Cir. 1976) (*en banc*) ("[d]istrict courts should grant severance" under Rule 14 "sparingly because of the 'strong interests favoring joint trials, particularly the desire to conserve the time of courts, prosecutors, witnesses, and jurors.'").

### 5. Any Possible Risk of Confusion Can Be Cured with Jury Instructions

As noted above, jury instructions can serve to mitigate any concerns by the defendant that jurors may inappropriately consider evidence against their clients. Courts in this jurisdiction have regularly pointed to the ability of courts to employ instructions to the jury as a way to mitigate concerns of spillover prejudice. *See, e.g.*, *Franklin*, 2005 WL 8157514, at *13 ("the Court also concludes that a jury could well be instructed — before and during trial, and before deliberations begin — on the separate nature of the charges of violence against Messrs. Franklin and Simmons,

and the verdict form can further emphasize these distinctions. *See Zafiro*, 506 U.S. at 541; *Spriggs*, 102 F.3d at 1257 (discussing effectiveness of curative instructions).

In *United States v. Gray*, Judge Lamberth explained that:

> Courts have the discretion to grant less extreme alternatives that may alleviate prejudice but not create an increased burden on the judicial system, such as additional jury instructions or separate juries. "When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but ... less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Richardson v. Marsh*, 481 U.S. 200, 211 (1987), cited in *Edelin*, 118 F. Supp. 2d at 42. Curative instructions are the preferred method of preventing prejudice to defendants; to assert severance over curative jury instructions, the defendant must show that jury instructions would be inadequate to cure any potential prejudice. *Edelin*, 118 F. Supp. 2d at 42.

*Id*. at 7 (D.D.C. 2001).

Because there are numerous ways that the Court can alleviate the defendants' concerns about potential prejudice that would not result in separate trials for each defendant, including limiting instructions, severance is not justified. The judicial economies of trying this conspiracy case as a single trial – where the evidence would otherwise be admissible in separate trials – strongly weigh in favor of denying the defendants' motions to sever.

Wherefore, the government respectfully requests that the Court deny Defendant Taylor and Defendant Sweeney's Motion to Sever.

## VII.    RESPONSE TO DEFENDANT MOORE'S MOTION TO SUPPRESS, OR, IN THE ALTERNATIVE, MOTION IN LIMINE [ECF 75]

A.    Factual Background

On May 29, 2018, officers from Prince George's County responded to a residence on Hammermill Field Drive in response to a call for an armed home invasion that had just occurred. During the course of the investigation into that offense, a Maryland detective was able to develop a suspect vehicle that was captured on camera leaving the scene of the offense. Law enforcement

identified the vehicle as a 2014 Nissan Maxima, registered to Defendant Darin Moore.

Based on the investigation into the suspect vehicle, on June 7, 2018, Detective Linden Edwards, of the Prince George's County Police Department's Criminal Investigation Division Robbery Section sought a warrant to attach a Global Positioning System tracking device to Defendant Moore's Maxima, as part of an ongoing investigation into a May 29, 2018, armed home invasion in Bowie, Maryland. Upon reviewing the application and affidavit of Detective Edwards, Judge Michael D. Whalen of the Circuit Court for Prince George's County, Maryland, found probable cause to issue the search and seizure warrant. The warrant authorized installation of a tracking device on Defendant Moore's vehicle for the purpose of tracking the movements of the vehicle. It further authorized law enforcement to monitor the tracker's signals for a period of thirty (30 days) and to collect the data from the device. The tracker was installed and Prince George's County began receiving data on the tracking device beginning on June 14, 2018, less than a week before the offenses charged in this case. On the morning of June 20, 2018, when Prince George's County detectives reviewed the data for the tracker on Moore's Maxima, they were well within the thirty-day window for accessing the data.

B.    Argument

For the reasons set forth below, the GPS tracker data for Defendant Moore's Maxima was lawfully obtained pursuant to a Maryland search warrant. During the period of time that the GPS tracker was lawfully on the vehicle, law enforcement could access and review the data 24-hours each day; if, during the course of monitoring that data, law enforcement learned of additional crimes committed by Defendant Moore, the defendant was not insulated from that lawfully obtained evidence being used against him in a prosecution for an unrelated crime. For instance, had law enforcement obtained a residential search warrant for an armed robbery and during the

course of executing that warrant, law enforcement recovered a firearm that had been used in an unrelated murder, the firearm would not be suppressed in the murder prosecution simply because it was evidence of more than one crime.  Here, the GPS data was lawfully accessed by Prince George's County law enforcement the morning of Simmons's murder.  Maryland detectives accessed the data and learned that Moore's Maxima was at the scene of both the abduction in Bowie, Maryland, as well as at the scene of the murder.  With this information, law enforcement then traveled to the location where the Maxima was parked outside of Moore's girlfriend's residence and saw evidence of the abduction and murder in plain view in the vehicle, including ski masks, zip-ties, blood, and damage to the Maxima consistent with descriptions of witnesses on the scene of the abduction who described the vehicle forcefully knocking Simmons off of the scooter. Based on the evidence observed in the Maxima, law enforcement towed the vehicle to a secure location and obtained a search warrant for the vehicle.  For the reasons detailed below, law enforcement was acting within the scope of a lawful warrant when it reviewed data for the GPS tracker on Moore's car that revealed him to be at critical locations for the charged conduct in this case.  Maryland law enforcement then lawfully shared the vehicle's location information with MPD and the FBI.

Additionally, not only is the GPS data admissible in this trial, but the facts and circumstances of the May 29, 2018, home invasion that led to the tracker being placed on the vehicle are also admissible, as detailed in the government's Motion to Admit Other Crimes Evidence Pursuant to Federal Rule of Evidence 404(b).  Because there are a number of non-propensity bases for the admission of evidence of the home invasion, including as evidence of Defendant Moore's efforts to target Simmons and his associates in the weeks leading up to the kidnapping, and because it is not unduly prejudicial, it should be admitted at trial.

1. Law Enforcement's Use of GPS Data from Lawful Maryland Tracker Warrant Was Proper

       i.     *Use of GPS Data Did Not Constitute Unlawful Search and/or Seizure*

The GPS data from the tracker that places Defendant Moore's vehicle throughout the course of the abduction – including at the scene of the abduction, at the scene of the murder, and with his co-conspirators following the murder – was lawfully obtained pursuant to a search warrant in Maryland and was lawfully shared between Maryland state law enforcement officers and MPD/FBI. Courts have regularly recognized the ability of law enforcement to share evidence across investigations.

For instance, in *United States v. Gargotto*, 476 F.2d 1009 (6th Cir. 1973), *cert. denied*, 421 U.S. 987 (1975), a Louisville police detective lawfully seized business records that were found at the scene of a fire which was the subject of an arson investigation. The detective examined the records and determined that they might be illegal betting records. The detective then contacted the IRS and turned the records over to the federal authorities. The records from the arson scene were then used in the prosecution of the owner of the records for tax fraud. The Sixth Circuit found no issue with the use of the records in the tax prosecution, stating: "Evidence legally obtained by one police agency may be made available to other such agencies without a warrant, even for a use different from that for which it was originally taken." *Id.* at 1014 (citing *Gullett v. United States*, 387 F.2d 307 (8th Cir. 1967), *cert. denied*, 390 U.S. 1044 (1968)).

The D.C. Court of Appeals has expressly adopted the reasoning of *Gargotto* in its recent decision, *United States v. Jackson*, 214 A.3d 464, 484 & n. 65 (D.C. 2019) ("The same principle applies to sharing evidence of a probationer's possible wrongdoing, including his whereabouts while under supervisory GPS tracking. As a general rule, courts have held that law enforcement agencies do not violate reasonable expectations of privacy or Fourth Amendment limitations by

sharing evidence and information they have acquired in lawful searches and seizures with other law enforcement agencies for legitimate law enforcement purposes" (emphasis added)).[18]

After deciding *Gargotto*, the Sixth Circuit addressed similar issues in *United States v. Lewis*, 504 F.2d 92 (6th Cir. 1974), *cert. denied*, 421 U.S. 975 (1975).  In *Lewis*, the defendants were convicted after the government introduced into evidence certain tools that had been obtained from Kentucky police officers without a warrant.  The tools had been used as evidence by the local officials in a state criminal proceeding.  After the conclusion of the first state trial, the defendants had filed a motion for the return of the items.  The defendants argued that use of the tools as evidence in the federal trial was impermissible because the government had not obtained a warrant for those items.  The Sixth Circuit rejected that argument, stating: "The fact that a motion has been filed for the return of the evidence has no bearing on the rule that one police agency need not get a warrant prior to obtaining evidence from another police agency." *Id.* at 104.[19]  The sharing of evidence between law enforcement entities is similarly recognized in the Ninth Circuit.  *See, e.g.*, *United States v. Hearst*, 563 F.2d 1331, 1347 (9th Cir. 1977), *cert. denied*, 435 U.S. 1000 (1978) (interagency exchange of evidence without warrant not violative of Fourth Amendment); *see also United States v. Mathews*, 250 F. Supp. 3d 806, 810 (D. Colo. 2017), aff'd, 928 F.3d 968 (10th Cir. 2019), cert. denied, No. 19-6060, 2019 WL 5686698 (Nov. 4, 2019) ("And, if Anderson lawfully obtained Mathews's GPS coordinates, nothing prevented him from sharing what he learned with federal investigators. 'Evidence legally obtained by one police agency may be made available to other such agencies without a warrant, even for a use different from that for which it

---

[18] In addition to citing the *Gargotto* decision, the D.C. Court of Appeals also relied upon *United States v. Jenkins*, 496 F.2d 57, 73 (2d Cir. 1974), discussed below, as authority for this proposition.

[19] *See also United States v. Montgomery*, 708 F.2d 343, 344 n.3 (relying on *Lewis* for proposition that "'Evidence legally obtained by one police agency may be made available to other such agencies without a warrant, even for a use different from that for which it was originally taken.'").

was originally taken.'" *United States v. Lester*, 647 F.2d 869, 875 (8th Cir. 1981); *see also*, 1 Wayne R. LaFave, Search & Seizure § 1.5(c) n.155 (5th ed., Oct. 2016 update) (citing additional similar cases); *Roudabush v. Nelson*, No. 13-cv-641, 2015 WL 11116755, at *3 (E.D. Va. 2015) (not reported) (relying upon *Gargotto* and *Hearst* to find no Fourth Amendment violation where federal investigators obtained evidence from local law enforcement entity that was lawfully in possession of the evidence).

Similarly, in *Jabara v. Webster*, 691 F.2d 272 (6th Cir. 1982), the Sixth Circuit was confronted with whether the defendant's Fourth Amendment rights were violated when the NSA transferred lawfully intercepted messages (overseas telegraphic message) in its possession to another law enforcement entity (the FBI). *Id.* at 279. The Court explained:

> We do not believe that an expectation that information lawfully in the possession of a government agency will not be disseminated, without a warrant, to another government agency is an expectation that society is prepared to recognize as reasonable. In this connection, we believe that it is irrelevant that Jabara did not know that the NSA had intercepted his messages. To hold otherwise would in many instances require, for Fourth Amendment purposes, a succession of warrants as information, lawfully acquired, is passed from one agency to another.

Id.

Similarly, in *United States v. Joseph*, 829 F.2d 724 (1987), the Ninth Circuit addressed – and rejected – a similar argument to the argument raised by Defendant Moore that the use of the data in the instant case exceeded the scope of the search permitted by state authorities. *Id.* at 728. In *Joseph*, business records were seized pursuant to a valid search warrant at the defendant's office as part of a Nevada investigation into the defendant's crime of practicing dentistry without a license. After that state investigation was concluded, the IRS obtained the records from the search warrant at the defendant's office and used those records as evidence in a case involving federal tax violations. The Ninth Circuit reasoned that:

… the IRS obtained Joseph's records from state authorities, not private parties. Federal examination of evidence in the state's possession does not constitute an independent search requiring the execution of a search warrant. *See United States v. Romero*, 585 F.2d 391, 396 (9th Cir. 1978), *cert. denied*, 440 U.S. 935 (1979); *accord Jabara v. Webster*, 691 F.2d 272, 279 (6th Cir. 1982), *cert. denied*, 464 U.S. 863 (1983). "This rule appears largely designed to avoid complex procedural barriers to cooperation between state and federal law enforcement authorities. Its theoretical underpinning must be that examination by another law enforcement agency is not a sufficiently distinct intrusion into the defendants' privacy to trigger the requirements of the Fourth Amendment." *Romero*, 585 F.2d at 396.

*Joseph*, 829 F.2d at 728; *see also, Sheffield v. United States*, 111 A.3d 611, 621 (D.C. 2015) (where police had already lawfully seized defendant's bloodstained pants in hospital, no need for warrant to extract blood from pants for DNA testing) (citing, *inter alia*, *United States v. Edwards*, 415 U.S. 800, 806 (1974) (where police already had "lawful custody" of defendant's clothing following his arrest on a separate crime, no need for warrant to conduct further examination of that clothing and discover evidence of another crime)).[20]

---

[20] Law-enforcement agencies routinely, and properly, share information and evidence with one another without violating Fourth Amendment rights. *See, e.g.*, *United States v. Jenkins*, 496 F.2d 57, 73 (2d Cir. 1974) (federal agent could view money to compare serial numbers in bank robbery investigation, after local police seized and held the money following defendant's arrest on unrelated state charges); *United States v. Turner*, 28 F.3d 981, 983 (9th Cir. 1994) (where defendant's cap had been legitimately seized from him at time of arrest by local police, federal investigator's subsequent, warrantless seizure of cap did not violate Fourth Amendment); *Addleman v. King County*, 2007 WL 1430195, *6 (W.D. Wash.) ("Once evidence has been validly seized, it is not a violation of the Fourth Amendment for one police agency to transfer legally seized evidence to another police agency.") (unpublished); *State v. Motley*, 571 S.E.2d 269, 273 (N.C. Ct. App. 2002) (transfer of seized rifle from one law-enforcement agency to another did not constitute search or seizure subject to constitutional scrutiny, because defendant no longer possessed reasonable expectation of privacy in property once it was lawfully seized); *Williams v. Commonwealth*, 527 S.E.2d 131, 136 (Va. 2000) ("We hold that when a person . . . has been lawfully arrested and his property has been lawfully seized by law enforcement personnel pursuant to that arrest, the arrestee has no reasonable expectation of privacy in that property, and later examination of the property by another law enforcement official does not violate the Fourth Amendment."); *Gee v. State*, 435 A.2d 1387, 1391 (Md. Ct. App. 1981) (collecting cases) (inspection by a Prince George's County policeman of the contents of defendant's wallet while it was in police custody did not require a warrant); *State v. Jackson*, 40 A.3d 290, 304 n.12 (Conn. 2012) (collecting cases regarding lawfulness of seizure by federal agents of evidence lawfully

The Ninth Circuit's reasoning in *Joseph* is similarly applicable here: the sharing of data lawfully in the hands of Maryland state authorities with another law enforcement entity is not a separate intrusion into the defendant's privacy that would require a second search warrant. This is particularly true where, as here, the abduction itself occurred in Prince George's County; detectives within the same office were thus investigating both the earlier home invasion, as well as the instant abduction. Requiring the detectives to essentially silo off information learned from one investigation as it may relate to a second investigation, would impair law enforcement's ability to investigate crimes and protect the community.[21]

Moreover, the fact that the detectives became suspicious when they heard that a black Nissan Maxima was used in the armed abduction when less than a week before they had begun tracking a similar vehicle for an armed offense in the same geographic area is not an unlawful intrusion on the defendant's privacy rights, but is itself evidence of collaboration and coordination by law enforcement entities. Similarly, had law enforcement been conducting a narcotics investigation with a target who was using a particular phone number (for whom they had obtained

---

seized by state actor).

[21] *See, e.g.*, *Texas v. Brown*, 460 U.S. 730 (1983):

> [R]equiring police to obtain a warrant once they have obtained a first-hand perception of contraband, stolen property or incriminating evidence generally would be a "needless inconvenience," that might involve danger to the police and public. We have said previously that "the permissibility of a particular law enforcement practice is judged by balancing its intrusion on ... Fourth Amendment interests against its promotion of legitimate governmental interests." (internal citations omitted)). In light of the private and governmental interests just outlined, our decisions have come to reflect the rule that if, while lawfully engaged in an activity in a particular place, police officers perceive a suspicious object, they may seize it immediately. *See Marron v. United States*, 275 U.S. 192(1927).

*Id.* at 739.

phone records) and learned during the course of the narcotics investigation that a kidnapping occurred with ransom calls placed from the drug trafficker's phone, it would be well within law enforcement's powers to use information learned during the investigation into the narcotics' investigation to connect the suspect to the phone used in the kidnapping.

### ii. *Even if a Second Warrant was Required, Exigent Circumstances Justified Accessing GPS Data*

Even if this Court were to find that Maryland law enforcement could not share the GPS data with other law enforcement entities without obtaining a second warrant, exigent searches existed to justify sharing the data before obtaining a second warrant for the data.  In *United States v. Carpenter*, 138 S. Ct. 2206 (2018), in the context of historic cell-site data, the Supreme Court acknowledged that although the government "generally need[s] a warrant to access CSLI [historical cell-site location information], case-specific exceptions may support a warrantless search of an individual's cell-site records under certain circumstances."  138 S. Ct. at 2222.  One prominent exception applies "when the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment."  *Kentucky v. King*, 563 U.S. 452, 460 (2011) (citation and internal quotation marks omitted).  "The core question is whether the facts . . . would lead a reasonable, experienced officer, to believe that there was an urgent need to . . . take action."  *United States v. Klump*, 536 F.3d 113, 117-118 (2d Cir. 2008) (internal citations and quotation marks omitted).

As the Court noted in *Carpenter*, exigencies traditionally recognized under Fourth Amendment law "include the need to pursue a fleeing suspect, protect individuals who are threatened with imminent harm, or prevent the imminent destruction of evidence."  138 S. Ct. at 2223 (emphasis added).  The Court further noted that if law enforcement "is confronted with an urgent situation, such fact-specific threats will likely justify the warrantless collection of CSLI."

Id.  Here, law enforcement had an urgent need to locate the Maxima used in the abduction and murder; any delay that would have resulted from presenting a second warrant to a judge based on the vehicle being present at both the scene of the abduction and the homicide, would likely have resulted in the destruction of evidence.  This is particularly true, where such efforts to destroy evidence were undertaken in at least one offense involving a member of this conspiracy. Specifically, Defendant Gabriel Brown is charged by Complaint in Superior Court Case No. 2019 CF1 003778, with his involvement in a murder.  In that offense, the vehicle used during the commission of a murder was driven to a second location where it was set on fire to destroy evidence shortly after the murder.  The effort to burn the vehicles following the offense in an effort to destroy evidence effectively eliminated the very evidence that was obtained here, due to the ability of law enforcement to quickly locate the vehicle.

Had law enforcement delayed in locating Defendant Moore's Maxima, the firearm within the glove compartment that was used during the abduction, as well as other evidence, including zip-ties, masks, gloves, and blood, would likely have been removed or otherwise hidden from law enforcement.  Although defendant contends in his Motion that the defendant was already murdered, eliminating any exigent circumstances, this is simply not true.  Had Andre Simmons still been alive, the exigencies of locating him (and rescuing him prior to him being executed), would of course be present; but the fact that he had already been murdered do not eliminate the exigency created by the risk of destruction of evidence, which has consistently been recognized as a basis for justifying a warrantless search (if a warrant was required, which it was not, for the reasons detailed above).

    2.   Even if Search Was Found to be Unlawful, Good-Faith Exception Applies

The GPS data from the vehicle tracker on Moore's Maxima was obtained in reasonable

reliance on the precedent detailed above that has consistently recognized the right for law enforcement to share data that was lawfully in its possession pursuant to a valid state search warrant that proved to be evidence of additional crimes. *See* Section VII.B.1.i, *supra*. The purpose of the exclusionary rule is to deter future Fourth Amendment violations, not to remedy past ones. *Davis v. United States*, 564 U.S. 229, 236-237 (2011). The Supreme Court has emphasized that "the exclusionary rule is not an individual right and applies only where it 'result[s] in appreciable deterrence.'" *Herring v. United States*, 555 U.S. 135, 141 (2009) (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)). Because suppression imposes a "'costly toll upon truth-seeking and law enforcement objectives'" by "letting guilty and possibly dangerous defendants go free," a court must find that "the benefits of deterrence . . . outweigh the costs" before excluding evidence obtained in violation of the Fourth Amendment. *Id.* (citation omitted); *Davis*, 564 U.S. at 237 ("Our cases hold that society must swallow this bitter pill when necessary, but only as a 'last resort.' For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.") (citation omitted).

       "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. Suppression may therefore be warranted "to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.*; *see Davis*, 564 U.S. at 240. "But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force and exclusion cannot pay its way." *Davis*, 564 U.S. at 238 (internal citations and quotation marks omitted).

In this case, the law enforcement team investigating the kidnapping and murder (including members of MPD, Prince George's County Police Department, and the FBI) obtained the Maxima's GPS data in reasonable reliance on well-established case law permitting law enforcement entities to share lawfully obtained evidence.  That no D.C. Circuit case has addressed this exact issue does not minimize the reasonableness of the reliance on precedent from outside of this circuit upholding the lawfulness of the sharing of data.  *See, e.g.*, *United States v. Katzin*, 769 F.3d 163, 180-181 (3d Cir. 2014) (pointing to near-consensus in out of circuit precedent in evaluating the reasonableness of law enforcement not obtaining a warrant).

Wherefore, the government respectfully requests that the Court deny Defendant Moore's Motion to Suppress the GPS Evidence from the Maxima and grant the Government's Motion to Admit Evidence of the May 29, 2018, Home Invasion.

## VIII.   RESPONSE TO DEFENDANT MOORE'S MOTION TO DISMISS COUNT THREE [ECF 74]

### A.    Background

Defendant Moore has been charged in Count 3 of the indictment with Using, Carrying, Possessing, Brandishing, and Discharging a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii), (iii).  The predicate crime of violence for Count 3, is set forth in Count 1, alleging a violation of 18 U.S.C. § 1201(a) (Kidnapping Resulting in Death).  The offense of Kidnapping Resulting in Death requires that the government establish:

1.   That on or about June 19, 2018, through June 20, 2018, the defendants unlawfully kidnapped, abducted, carried away or held Andre Simmons;

2.   That the defendants kidnapped Andre Simmons for some purpose or benefit;

   3.   That the defendants willfully, knowingly and unlawfully transported Andre Simmons across the state line from Maryland to the District of Columbia; and

   4.   Andre Simmons, died as a result of defendants' actions.

*See, e.g.*, *United States v. Lentz*, 383 F.3d 191, 202 (4th Cir. 2004) (citing elements, including added element that defendant's actions resulted in victim's death); *United States v. Barraza*, 576 F.3d 798, 807 (8th Cir. 2009) (same); Pattern Jury Instructions for Federal Criminal Cases:  District of South Carolina (2016 Online Edition), pp 233-34 available at https://www.govinfo.gov/content/pkg/USCOURTS-ca4-16-04226/pdf/USCOURTS-ca4-16-04226-0.pdf; Tenth Circuit Criminal Pattern Jury Instructions, pp. 176-77, available at https://www.ca10.uscourts.gov/sites/default/files/clerk/Jury%20Instructions%20Update%202015_0.pdf.

   B.  <u>Argument</u>

Although violations of the federal kidnapping statute, 18 U.S.C. § 1201(a), typically do not qualify as a crime of violence under the elements clause, one exception to that general rule is Section 1201's provision for kidnapping offenses in which "the death of any person results." 18 U.S.C. § 1201(a).  That provision carries an enhanced penalty (death or life imprisonment), and thus is properly understood as an aggravated offense that is divisible from typical kidnapping.  *See Burrage v. United States*, 571 U.S. 204, 210 (2014) ("Because the 'death results' [penalty] enhancement [in 21 U.S.C. § 841(b)] increased the minimum and maximum sentences to which Burrage was exposed, it is an element that must be submitted to the jury and found beyond a reasonable doubt."); *see also Mathis v. United States*, 136 S. Ct. 2243, 2256 (2016).  Accordingly,

kidnapping resulting in death – unlike regular kidnapping – satisfies the elements clause of Section 924(c)(3)(A) and qualifies as a crime of violence.

Moreover, Congress's use of the term "results" requires a causal connection between the kidnapping and the death; it would not be sufficient, for example, to show that the victim happened to die of natural causes during the course of a kidnapping. *See, e.g.*, *Burrage*, 571 U.S. at 214 ("a phrase such as 'results from' imposes a requirement of but-for causation"); *United States v. Hayes*, 589 F.2d 811, 821 (5th Cir. 1979) (holding that the "death results" provision of 18 U.S.C. § 242 incorporates general principles of causation and noting that death would not "result" from a Section 242 violation if the victim is struck by lightning while being detained pursuant to an illegal arrest); *see also Burrage*, 571 U.S. at 210 (reserving question of whether proximate causation is required for death to "result from" drug distribution).

To the extent Defendant Moore might argue that there is a scenario in which a defendant could theoretically commit a kidnapping resulting in death without any application of "physical force," such as a kidnapping by inveiglement during which the victim dies as a result of inaction by the defendant, such conduct would not be covered by the statute and can be disregarded for purposes of applying the categorical approach.  The Supreme Court and courts of appeals have repeatedly cautioned against using "legal imagination" to treat an offense as categorically overbroad. *Moncrieffe v. Holder*, 569 U.S. 184, 191 (2013) (quoting *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007)); *see, e.g.*, *United States v. Maxwell*, 823 F.3d 1057, 1062 (7th Cir. 2016) (defendant cannot "rely on fanciful hypotheticals not applicable in real world contexts (apart from law school exams)" to show categorical overbreadth); *United States v. Evans*, 924 F.3d 21, 30 (2d Cir. 2019), cert. denied, No. 19-6116, 2019 WL 5875226 (Nov. 12, 2019) (noting that "for the purposes of applying the categorical approach, 'hypotheticals are insufficient' because a defendant

must show that there is a 'realistic probability' that federal bank robbery would reach the conduct Evans describes" and rejecting "'legal imagination'" of a "bank robbery by poison" hypothetical); *United States v. Bell*, 901 F.3d 455, 471 (4th Cir. 2018) (rejecting hypotheticals where defendant has shown "a theoretical possibility," rather than a "realistic probability that the conduct at issue would meet the elements of the offense").

In Count 1 of the Indictment, Defendant Moore is charged not merely with kidnapping, but kidnapping <u>that results in death</u>. This requires an added element of proof that would not otherwise be required for a generic kidnapping. *See, e.g.*, *Lentz*, 383 F.3d at 202; *Barraza*, 576 F.3d at 807. Because the added element of proof requires use, attempted use, or threatened use of physical force, the offense of kidnapping resulting in death satisfies the elements clause and qualifies as a crime of violence.

Wherefore, the government respectfully requests that the Court deny Defendant Moore's Motion to Dismiss Count Three.

## IX.   <u>RESPONSE TO DEFENDANT SWEENEY'S MOTION IN LIMINE REGARDING DNA [ECF 80]</u>

On November 1, 2019, defendant John Sweeney (defendant) filed a motion *in limine* [ECF No. 80] that appears to challenge the reliability of "PCR" and "STR" DNA testing under Rule 702 and the prejudicial impact of such evidence under Rule 403. Defendant's motion is nothing more than a series of conclusory, unsupported assertions. ECF 80 at 2. PCR-STR DNA testing has been the cornerstone of DNA testing for decades. This method forms the basis for most DNA testing in local, state, federal, and private accredited laboratories in the United States and throughout the world. DNA testing is a unique form of forensic evidence insofar as the statistical calculation attendant to an analyst's conclusion properly informs the Court and the jury of the probative value,

or lack thereof, of a particular result.  Accordingly, defendant's efforts to exclude such evidence as unreliable or prejudicial is frivolous.

A.    Background

Polymerase chain reaction (PCR) is a technique dating back to the 1980s that mimics cell division by making millions of copies of a targeted DNA sequence.  It has been one of the greatest advances in DNA profiling.  The development of this methodology had such scientific significance that Kary Mullis was awarded The Nobel Prize in Chemistry in 1993 for "his invention of the polymerase chain reaction (PCR) method" (The Nobel Prize in Chemistry 1993).[22]  As noted by author John Butler, the benefits of PCR are vast:

> Forensic science and DNA typing laboratories have greatly benefited from the discovery of a technique known as the polymerase chain reaction or PCR. First described in 1985 by Kary Mullis and members of the Human genetics group at the Cetus Corporation (now Roche Molecular Systems), PCR has revolutionized molecular biology with the ability to make millions of copies of a specific sequence of DNA in a matter of only a few hours. Without the ability to make copies of DNA samples, many forensic samples would be impossible to analyze. DNA from crime scenes is often limited in both quantity and quality and obtaining a cleaner, more concentrated sample is normally out of the question…. The PCR DNA amplification technology is well suited to analysis of forensic DNA samples because it is sensitive, rapid, and not limited by the quality of the DNA as the restriction fragment length polymorphism (RFLP) methods are.

Butler, Forensic DNA Typing at 63 (2005).[23]

_____

[22] NobelPrize.org. Nobel Media AB 2019. Mon. 9 Dec 2019. https://www.nobelprize.org/prizes/chemistry/1993/summary/).

[23]  It is important to note that while PCR is well suited for human identity and DNA forensics, its application extends beyond Forensics. Because PCR is a molecular biology technique, it has become a routine technique in other areas of science such as the detection of microorganisms for environmental studies, cloning, the detection of GMO's, and medicine to diagnose genetic diseases.

Equally significant was the advent of DNA markers known as Short Tandem Repeats (STRs) in the late 1990s that have high discriminating power, low mutation rates and robustness that make STRs highly desirable.

> STRs have become popular DNA repeat markers because they are easily amplified by the polymerase chain reaction (PCR)…. The number of repeats in STR markers can be highly variable among individuals, which make these STRs effective for human identification purposes…. For human identification purposes it is important to have DNA markers that exhibit the highest possible variation or a number of less polymorphic markers that can be combined in order to obtain the ability to discriminate between samples.

Butler, Advanced Topics in Forensic DNA Typing: Methodology at 99-101(2011). Importantly, the biology of STRs and the technology by which they are produced are well established:

> With more than 2000 papers now available describing STR markers, technology for typing these STRs, and allele frequencies in various populations around the world, the scientific bases for forensic DNA typing is sound. The basic foundational material in the first edition is still relevant and thus has remained essentially unchanged.

Butler, Forensic DNA Typing at x-xi (2005). Aside from its speed of analysis and accompanying high power of discrimination, STRs can "successfully measure sample mixtures and biological materials containing degraded DNA molecules." Butler, Forensic DNA Typing at 5 (2005). Near universal use and acceptance of STRs led to use of these markers in the Combined DNA Index System (CODIS) database.

In the instant case, Signature Science, an accredited DNA testing laboratory, issued several voluminous reports. Some of the reports contain conclusions specifying whether defendant's inclusion or exclusion is favored in a profile generated from a particular piece of evidence through a statistic known as a likelihood ratio.

B.    <u>Argument</u>

As early as 1997, one federal court observed, "although PCR is a relatively new technology, it is based on sound scientific methods and it has quickly become a generally accepted technique in both forensic and non-forensic settings." *United States v. Shea*, 957 F. Supp. 331, 338 (D.N.H. 1997), *aff'd* 159 F.3d 37 (1st Cir. 1998).   Shortly thereafter, many court decisions discussed how PCR/STRs had become widely embraced by the scientific community.   *See e.g. State v. Butterfield*, 27 P.3d 1133, 1142-43 (Utah 2001) ("PCR-based testing, which encompasses STR testing, has been held to be a scientifically correct and reliable technique by a vast majority of courts in other jurisdictions."); *United States v. Trala*, 162 F. Supp. 2d 336, 347-48 (D. Del. 2001) (PCR/STR profiling is generally accepted by the relevant scientific community and widely accepted in the U.S. and internationally), *aff'd* 386 F.3d 536 (3d Cir. 2004).   Today, every accredited local, state, and federal CODIS laboratory in the United States conducts DNA testing using PCR-STRs.   Not surprisingly, an array of amplification methodology is routinely admitted throughout the country under Rule 702.   *See e.g.*, *United States v. McCluskey*, 954 F. Supp. 2d 1224, (D.N.M. 2013) ("[I]t is clear that the PCR/STR method can be and has been extensively tested, it has been subjected to peer review and publication, there is a low error rate according to NRC (2009), and there are controls and standards in place…. Based on overwhelming scientific and forensic acceptance, as well as acceptance by the vast majority of courts, this Court concludes that PCR/STR method of DNA typing is reliable and admissible under Rule 702 and *Daubert*.").   Any attempt to preclude the admissibility of this methodology under Rule 702 is frivolous.

Defendant asserts, "Any type of DNA analysis which employs PCR on short tandem repeat loci involves a multitude of complicated steps, procedure and protocols which must be adhered to if the results are to be deemed reliable."   ECF at 3.   Here, the procedures and protocols used by

Signature Science are rooted in internal validation of the Globalfiler PCR Amplification Kit that demonstrated the kit's reliability and suitability for amplification of casework DNA samples. Adherence to these procedures are specified at the "End of Report" page of each report issued in this case that state, "[d]ata reported in this case were determined by procedures that have been validated according to standards established by the Scientific Working Group on DNA Analysis Methods (SWGDAM) and adopted as Federal Standards."

To ensure reliability of the testing results, Signature Science monitors the effectiveness of the PCR process during testing by incorporating a positive control and a negative control alongside casework samples in *every* amplification test. "A positive amplification control is an analytical control sample that is used to determine if the PCR performed properly. This control consists of the amplification reagents and a known DNA sample." FBI Quality Assurance Standards, 2011 at 61. A positive control is a valuable indicator of the success of a PCR reaction and expected results ensure confidence in results of DNA profiling. In the Signature Science discovery files for this case, support for *passing* PCR positive controls, as well as negative controls (that monitor for contamination), can be found on the, "CE Data Analysis Worksheet" in discovery. The data evaluation section of the CE Data Analysis Worksheet for this case demonstrates the controls for STR typing passed and were verified by a second analyst. In other words, all positive and negative controls held, meaning the amplification kit performed as expected and there was no indication of contamination. In sum, the discovery materials reveal that the Signature Science DNA analyst reliably applied the PCR/STR methodology in this case.

For the foregoing reasons, defendant's request to exclude DNA testimony is frivolous and should be denied without a hearing.

X.    **RESPONSE TO DEFENDANT BROWN'S MOTION TO SUPPRESS TANGIBLE EVIDENCE [ECF 81]**

The United States hereby submits this opposition to the Defendant Gabriel Brown's Motion to Suppress Tangible Evidence [ECF 81].

A.    Background

As a result of the investigation of the June 19-20, 2018, kidnapping and homicide of Andre Simmons, Jr., summarized *supra,* law enforcement personnel applied for and received multiple search warrants for residences, historic cell-site data, digital devices, a vehicle (black Acura bearing D.C. tag FL9471), and an iCloud account linked to Defendant Brown. The government obtained the following search warrants pertaining to locations, devices, and accounts linked to Brown:

- 611 Elmira Street, S.E., Washington, D.C. (Case No. 18-sw-00165)
- Black Acura TL, D.C. Tag FL9471 (Case No. 18-sw-00168)
- Historical Cell Site Warrant for T-Mobile Phone Number 571-351-7141 (Case No. 18-sc-02314)
- Apple iCloud account with Apple ID giannibrown15@icloud.com (Case No. 18-sc-03090)
- A PlayStation 4 Gaming System (Case No. 18-sw-287)
- iPad (Case No. 18-sw-288)
- Buccal Swab for Gabriel Brown (Case No. 18-sw-00195)
- Second Historical Cell Site Warrant for T-Mobile Phone Number 571-351-7141 (Case No. 19-sw-80)

In his motion, Defendant Brown moves to suppress "all evidence seized, directly or derivatively, in violation of the Fourth Amendment…from (1) a residence at 611 Elmira Street, S.E., Washington, D.C. 20032; (2) various electronic devices, including a PlayStation gaming system; (3) a black Acura automobile; (4) social media; and (5) other locations and items." *See* ECF 81 at 1. Defendant Brown's motion only specifically addresses the search warrant affidavit filed for the 611 Elmira Street address; however, it appears that the defendant nevertheless seeks to challenge the other warrants, claiming that "[t]he search warrant applications lacked sufficient

58

probable cause to support the issuance of a warrant." *Id.* at 2. For the reasons detailed below, Defendant Brown's Motion should be denied.[24]

    B.    Argument

    *1.    Defendant Brown Lacks Standing to Challenge Search at 611 Elmira Street and Search of Acura*

It is well established that "[a] defendant must have standing to challenge an allegedly unlawful search or seizure and to seek suppression of evidence derived therefrom…," and "Fourth Amendment rights are 'personal' rights and not to be asserted by third parties." *United States v. Savoy,* 889 F. Supp. 2d 78, 86 (D.D.C. 2012) (citing *Rakas v. Illinois,* 439 U.S. 128, 132-34 (1978). The party moving for suppression of evidence "derived from an unlawful search bears the burden of demonstrating that he has standing." *Id.* at 104. The defendant's motion fails to assert any facts establishing that he has standing to challenge the search warrants issued in this matter.

First, with respect to the search warrant for 611 Elmira Street SE, the defendant himself argues that he lacks a connection to the residence, an admission that directly contradicts any argument that he has standing to challenge a search warrant for that address. *See* ECF 81 at 4 (contending that "with respect to the premises on Elmira Street, the Affidavit failed to show a recent connection to Mr. Brown that is necessary to comply with the Fourth Amendment."). Absent the defendant asserting facts that would support Defendant Brown's legitimate expectation of privacy in 611 Elmira, he has no standing to challenge the search warrant. *See, e.g.*, *United States v. Wiley*, 847 F.2d 480, 481 (8th Cir. 1988) (party challenging search of residence had failed to establish legitimate expectation of privacy in the residence that was searched); *see also United*

---

[24] Other than the search warrants bulleted *supra,* the government is not aware of any other search warrants issued that the defendant might have a colorable claim of standing to challenge.

*States v. Nabors*, 761 F.2d 465, 468 (8th Cir. 1985), *cert. denied*, 474 U.S. 851 (1985), *reh'g denied*, 474 U.S. 1077 (1986) (defendant did not have legitimate expectation of privacy in girlfriend's house, even though he was present at residence at time of search).

Similarly, the defendant lacks standing to challenge the search warrant for the black Acura. The black Acura was owned and registered to the defendant's girlfriend. The defendant fails to articulate any facts in his motion establishing a property or possessory interest in the vehicle. *See, e.g.*, *United States v. Jefferson*, 925 F.2d 1242, 1249 (10th Cir. 1991), *cert. denied*, 502 U.S. 884 (1991) (non-owner passenger lacked standing to challenge search even though he shared in the driving in a long-distance trip); *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1162 (10th Cir. 1995) ("neither the fact that Joe Eylicio borrowed the Dodge from the owner nor the fact that the owner permitted Ms. Eylicio–Montoya to ride in the car establishes that Ms. Eylicio–Montoya had a legitimate expectation of privacy in it.").

Finally, because Defendant Brown's Motion only vaguely references searches of unspecified "electronic devices," "social media accounts," and "other locations and items" (ECF 81 at 1), without providing any specificity, the government has no way to determine which searches the defendant is challenging, nor does the defendant provide any basis establishing his standing to challenge such searches.

2. *Even if Defendant had Standing to Challenge Searches, There was Probable Cause Supporting the Issuance of the Search warrants Referenced Above*

A search warrant is supported by probable cause where it establishes "a fair probability of criminal activity" and a "nexus between that activity and the place to be searched." *Savoy,* 889 F. Supp. 2d at 88. It is axiomatic that "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay

information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates,* 462 U.S. 213, 238 (1983). Further, "[a] reviewing court should accord great deference to a magistrate's determination of probable cause." *United States v. Reed,* 195 Fed. Appx. 815, 822 (10th Cir. 2006). The court's duty is "simply to ensure that the magistrate had a substantial basis for ... conclud[ing] that probable cause existed." *Id.* (quoting *Gates,* 462 U.S. at 238-239. This deference is appropriate to further the Fourth Amendment's strong preference for warrants. *See Massachusetts v. Upton,* 466 U.S. 727, 733 (1984); *United States v. Ventresca,* 380 U.S. 102, 105–106 (1965) ("An evaluation of the constitutionality of a search warrant should begin with the rule that the informed and deliberate determinations of magistrates empowered to issue warrants ... are to be preferred over the hurried action of office[r]s"). Because of the strong preference for warrants, "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." *Ventresca,* 380 U.S. at 106.

"The deference accorded a magistrate judge's probable cause determination, however, is not boundless." *United States v. Alabi,* 943 F. Supp. 2d 1201, 1253 (D.N.M. 2013) (citing *United States v. Leon,* 468 U.S. 897, 914 (1984)). The court should not defer to a magistrate judge's probable-cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause. *See United States v. Danhauer,* 229 F.3d 1002, 1006 (10th Cir. 2000). Specifically, the court should not defer to a magistrate judge's probable-cause determination if it "is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances." *Reed,* 195 Fed. Appx. at 822 (citing *Leon,* 468 U.S. at 915; *Upton,* 466 U.S. at 734; *Gates,* 462 U.S. at 239).

Even when it is ultimately determined that a search warrant was lacking in probable cause, evidence shall not be suppressed where law enforcement's reliance on the warrant was reasonable.

*See United States v. Maxwell*, 920 F.2d 1028, 1034 (D.C. Cir. 1990) ("the exclusionary rule should not be applied to exclude evidence seized pursuant to a defective search warrant if the officers conducting the search acted in 'objectively reasonable reliance' on the warrant and the warrant was issued by a detached and neutral magistrate").

In his motion, Defendant Brown makes conclusory assertions regarding the lack of probable cause in the search warrant affidavits, and to the extent that he provides any specific claims, it is only as to the search warrant executed at 611 Elmira Street, S.E.[25]  As to this location, the defendant claims that the affidavit did not assert "that law enforcement or others observed any criminal activities at the residence..." and that the affidavit did not "explicitly assert that Mr. Brown resided at that address at a sufficiently recent time to authorize the search…"  ECF 81 at 2. Concerning the defendant's first claim, the government need only show "a fair probability of criminal activity," and a "nexus between that activity and the place to be searched.  In other words, it requires a 'fair probability that contraband or evidence of a crime will be found *in a particular place.'"  Savoy*, 889 F. Supp. 2d at 88 (quoting *Gates,* 462 U.S. at 237).

The affidavit in support of the search warrant for 611 Elmira Street details facts establishing the abduction of the victim, the ransom demand, and the eventual murder of the victim. *See* Exhibit A at 3-4.  The affidavit also links Defendant Brown to this activity through observations of the black Acura identified by police as being used to pick up the ransom money, the fact that it was registered to Defendant Brown's girlfriend, and the second sighting of that vehicle later on the same day of the murder.  *Id.* at 4, 8-9.  Specifically, the affidavit asserts that during the second sighting of the Acura, the defendant's girlfriend, Shelita Thompson, exited the

---

[25]  The affidavit in support of the search warrant for 611 Elmira Street, S.E., is attached as Exhibit A.

vehicle as the Capitol Police pursued the Acura, and during a later interview with police, Thompson identified Defendant Brown as the driver of the Acura.  *Id.* at 8-9.  Further, the affidavit set forth facts establishing that GPS data for co-defendant Darin Moore's vehicle, which was also used to abduct the victim and was present at the location of the homicide when the victim was shot to death, placed Moore's vehicle in the immediate vicinity of Thompson's address approximately 20 minutes after the murder.  *Id.* at 6.  Also detailed in the affidavit is the fact that GPS data showed Moore's vehicle drive into the 600 block of Elmira Street, S.E., and stop to let an individual out of the vehicle after it left Thompson's residence.  *Id.* at 6-7.  The affidavit further asserts facts that link Defendant Brown to 611 Elmira Street.  Specifically, the affidavit states that public records checks showed that 611 Elmira Street was listed as Defendant Brown's current address and that Brown's cousin owned that residence.  *Id.* at 9.  Furthermore, the affidavit stated that law enforcement databases established that Defendant Brown had reported 611 Elmira Street as his residence, and that in August of 2017, a complainant from a destruction of property incident reported this address as Brown's residence.  *Id.*

The affidavit also sets forth a factual basis to believe that contraband and evidence connected to the kidnapping and murder would be found inside Defendant Brown's residence. Specifically, in paragraph 24(a)-(d), the affiant stated that based upon his training and experience, individuals involved in kidnappings for ransom frequently maintain in their residences "records and documents evidencing their criminal activities in connection with the kidnaping, such as photographs, notes, receipts and bills from the purchase of equipment utilized to effect and maintain the abduction, documents and records evidencing travel in interstate or foreign commerce, money orders, cashier's' checks, money wires, and other records of financial transactions engaged in as part of the criminal activity," as well as "photographs of themselves,

their associates, their property and illegal contraband," and that "[t]hese photos are usually maintained in their place of residence, or the residences of family members, friends or associates, in their business locations." *Id.* at 9-10.[26]

The affidavit in support of the search warrant for 611 Elmira Street provides sufficient facts to establish probable cause that Defendant Brown participated in the abduction, kidnapping, and murder of the victim, and that evidence and contraband linked to those offenses would be located at that address. The other search warrants listed above for property linked to Defendant Brown all include similar information included in Exhibit A as well as additional evidence establishing Brown's connection to his co-defendants, facts linking him to the property to be searched, and the basis for probable cause to believe evidence and contraband related to the aforementioned offenses would be located during a search of the listed property. As discussed *supra,* Defendant Brown's motion fails to articulate in any manner how these search warrants are deficient, and why the magistrate's probable cause determination for these searches should be overturned.

In the event that it is determined that the challenged search warrants lacked probable cause, the government submits that law enforcement officers reasonably relied on the warrants, which were issued by a neutral and detached magistrate. Accordingly, the government further submits that the evidence obtained as a result of these search warrants should not be excluded under the Exclusionary Rule. *Maxwell,* 920 F.2d at 1034.

Wherefore, the government requests that Defendant Brown's Motion to Suppress Tangible Evidence be denied.

---

[26]  The affidavit in support of the search warrant for the Acura vehicle contained substantially the same factual assertions as were detailed in the affidavit in support of the search warrant for 611 Elmira Street.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, by filing the foregoing via the Court's Electronic Case Filing System, I caused a copy of the foregoing to be delivered electronically to counsel of record, on December 13, 2019.


\_\_\_\_/_____
Laura Crane
Assistant United States Attorney