**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES of AMERICA | ) | |
| | ) | |
| vs. | ) | No. 18-cr-198-JEB-3 |
| | ) | |
| JAMES THOMAS TAYLOR, Jr., *et al.,* | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF
DEFENDANT JAMES TAYLOR'S MOTION TO DISMISS THE
INDICTMENT FOR VIOLATION OF THE SPEEDY TRIAL ACT
AND THE SIXTH AMENDMENT'S GUARANTEE OF A SPEEDY TRIAL**

The Sixth Amendment to the United States Constitution guarantees criminal defendants a "speedy trial."  And the Speedy Trial Act ("STA") requires that trial begin within 70 days from the date an indictment is filed, or from the date the defendant appears before the court in which the charge is pending, whichever is later.  18 U.S.C. § 3161(c)(1).

Defendant James Taylor was arrested and brought before the Court for his initial appearance and arraignment on August 20, 2018.  The United States filed a Superseding Indictment formally charging him in this case on January 22, 2019.  However, Mr. Taylor's trial Is not scheduled to begin until March 8, 2021 – 931 days after his initial appearance, and 776 days after he was indicted.

In response to the ongoing COVID-19 pandemic, this Court has entered a series of Standing Orders postponing all jury trials and excluding the time of that postponement from the STA calculation.  Under the most recent Standing Order, dated August 10, 2020,

jury trials are postponed – and time excluded under the STA – until at least November 9, 2020.  In this case, the Court has entered the Court has entered a series of Orders further excluding from the STA calculation all time until March 8, 2021.  However, as is fully described below, the orders excluding this time from the Speedy Trial calculation are invalid.

Moreover, the circumstances preventing jury trials from proceeding in this Court are the direct result of decisions made, and actions implemented by, the United States.  As a result of the extraordinary delay in this case, Mr. Taylor's claim of a violation of his right to a speedy trial has "prima facie merit," and a presumption of prejudice.  And because the delay has been caused entirely by the United States' negligence (or worse), the government cannot meet its "heavy burden" to justify the  delay.  Therefore, Mr. Taylor's Sixth Amendment right to a speedy trial has been violated, and the case against him should be dismissed.  *Barker v. Wingo,* 407 U.S. 514 (1972) (remedy for denial of right to a speedy trial is dismissal of the indictment).

### FACTS

On December 31, 2019, the Wuhan (China) Municipal Health Commission reported that 44 individuals – 11 of whom were "severely ill" – had contracted a previously unknown viral respiratory illness, described as "pneumonia of unknown cause."  World Health Organization, *Disease outbreak news:  Pneumonia of unknown cause – China* (January 5, 2020), *available at* https://www.who.int/csr/don/05-january-2020-pneumonia-of-unkown-cause-china/en/.   The World Health Organization ("WHO") reported that there was "limited information to determine the overall risk of this reported cluster of pneumonia

of unknown etiology," but warned that it "should be handled prudently."  *Id.*  The United States Government was aware of the situation in Wuhan, and the possibility of a pandemic, by the beginning of January 2020.  Bob Woodward, *Rage*, Simon & Schuster, (2020), at 212-215.

On January 19, 2020, Chinese authorities reported a "sharp uptick" in the number of confirmed cases of the disease and confirmed that the disease is spread from human to human, "a development that raises the possibility that it could spread more quickly and widely."  Yanan Wang & Ken Moritsugu, *Human-to-human transmission confirmed in China coronavirus*, AP News (January 19, 2020), *available at* https://apnews.com/14d7dcffa205d9022fa9ea593bb2a8c5.  By that date, the United States Centers for Disease Control ("CDC") was already aware that the virus could be transmitted from human to human, and that it could be transmitted by individuals who had the virus, but were asymptomatic, both of which made a pandemic more likely.  *Rage* at 219-20.

On January 21, 2020, the first confirmed case of the virus in the United States was reported in Washington State.  Roni Caryn Rabin, *First Patient With Wuhan Coronavirus Is Identified in the U.S.,* The New York Times (Jan. 21, 2020), *available at* https://www.nytimes.com/2020/01/21/health/cdc-coronavirus.html.  At the time, it was reported that the disease had "killed at least six people and sickened hundreds more in Asia."  *Id.*  At President Trump's Presidential Daily Briefing on January 28, 2020, National Security Advisor Robert O'Brien advised the President that the virus would be the biggest national security threat of his presidency.  *Rage* at 232-233.  On January 30, 2020, WHO

declared the outbreak a "public health emergency of international concern (PHEIC)," WHO's highest level of alarm. *Timeline: WHO's COVID-19 Response*, *available at* https://www.who.int/emergencies/diseases/novel-coronavirus-2019/interactive-timeline.

In February 2020, residents of the United States began to die from the disease. Thomas Fuller & Mike Baker, *Coronavirus Death in California Came Weeks Before First Known U.S. Death*, The New York Times (April 22, 2020, updated May 7, 2020), *available at* https://www.nytimes.com/2020/04/22/us/coronavirus-first-united-states-death.html. By the end of February, it was reported that 299 Americans had contracted the disease, 7 of whom had died.  The Atlantic, *COVID Tracking Project, US Daily Cumulative Totals, available at* https://covidtracking.com/data/us-daily (hereinafter, "COVID Tracking Project").

On March 11, 2020, WHO officially declared the disease's outbreak a pandemic. WHO, *WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020*, *available at* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.   In making this announcement, WHO's Director-General stated that the pandemic "can be controlled," and called for all nations "to take urgent and aggressive action."  *Id.*  He noted that by such action, several countries – including Iran, Italy, and South Korea – had "slow[ed] the virus and controlled their epidemics," and went on:

> We cannot say this loudly enough, or clearly enough, or often enough: all countries can still change the course of this pandemic.  If countries detect, test, treat, isolate, trace, and mobilize their people in the response, those with a handful of cases can prevent those cases becoming clusters, and those clusters becoming community transmission.  Even those countries with community transmission or large clusters can turn the tide on this

virus. Several countries have demonstrated that this virus can be suppressed and controlled. The challenge for many countries who are now dealing with large clusters or community transmission is not whether they *can* do the same – it's whether they will. Some countries are struggling with a lack of capacity. Some countries are struggling with a lack of resources. Some countries are struggling with a lack of resolve.

*Id.*

Countries that followed the WHO advice were able to control the spread of COVID-19. Despite its proximity to the virus' source,[1] Taiwan has reported only 553 cases of COVID-19 and only 7 deaths. Taiwan achieved these results with a "centralized" government response that was "seen as convincing and credible," using contact tracing to identify and quarantine infected individuals, and using "aggressive precautionary measures" like temperature-taking and providing sanitizers to keep businesses open. Ian Bremmer, *The Best Global Responses to COVID-19 Pandemic*, Time (June 12, 2020), *available at* https://time.com/5851633/best-global-responses-covid-19/ (hereinafter, "Bremmer")

South Korea made an "aggressive early response" to the pandemic, with "continued vigilance, extensive testing and contact tracing, isolation, and treatment of confirmed cases." *Id.* As a result, that country's case and fatality counts have been described as "the envy of major industrial democracies." *Id.* Although the United States' population is less than 7 times that of South Korea, the U.S. has reported 340 times as many cases of COVID-19, and nearly 500 times as many

---

[1] Taiwan is approximately 625 miles from Wuhan, China.

deaths.   *See* Johns Hopkins University Coronavirus Resource Center, *Cases and Mortality by country, available at* https://coronavirus.jhu.edu/data/mortality.

As a result of its government's  "early response and coordinated messaging," — including a "lockdown" in which residents were required to remain at home and provided "emergency text messages that plainly explained what was expected of individuals," *id.* – New Zealand was able to lift its COVID  restrictions in June 2020, BBC News, *New Zealand Lifts All COVID Restrictions, Declaring the Nation Virus-Free, (June 8, 2020), available at https://www.bbc.com/news/world-asia-52961539.*  Notably, jury trials – which had been suspended in March – have resumed.  New Zealand Ministry of Justice, *Information for all Court Users,* available at https://www.justice.govt.nz/covid-19-information/information-for-all-court-users/https://www.courtsofnz.govt.nz/assets/8-May-Media-Release-CJ-v2.pdf; *Resumption of Jury Trials in Auckland From 7 September 2020, available at* https://www.courtsofnz.govt.nz/assets/20-09-03-Sept-MR-1-Resumption-of-jury-trials-in-Auckland.pdf.

By contrast to the successes in these and other nations, COVID-19 has spread like wildfire in the United States.  By the end of March, it was reported that COVID-19 had been contracted by approximately 200,000 Americans, more than 4,000 of whom had died.  *COVID Tracking Project, supra.*  For months, the number of COVID-19 cases and deaths in the United States has continued to skyrocket:

## US COVID-19 CASES 2020



## US COVID-19 DEATHS 2020



*Id.*   As of the date of this filing, nearly 9 million Americans have contracted COVID-19, and more than 228,000 have died.   *Id.*

These numbers make clear not only that the United States has done a poor job of controlling the virus, but also that it has done far worse than other nations.   *See* Select Comm. on the Coronavirus Crisis, Committee on Energy and Commerce, Committee on Ways and Means, Committee on Financial Services, Committee on Oversight and Reform, Committee on Education and Labor, and Committee on Small Business, United States House of Representatives, *A Failure to Lead: The Trump Administration's Disastrous Response to the Coronavirus Pandemic*. (August 2020) (Exh. A hereto).   The United States has had more COVID-19 cases, and more deaths, than any other country in the world.

And this is not attributable to population.   *See* Johns Hopkins University Coronavirus Resource Center, *Cases and Mortality by country, available at* https://coronavirus.jhu.edu/data/mortality.   Although the United States is the third-most populous country on earth, only about 4% of the world's population resides here. Nevertheless, 20% of the world's COVID-19 cases and deaths have occurred in the United States.[2]   Moreover, the United States' mortality rate per 100,000 population – which compares the effect of COVID-19 in various nations while holding population

---

[2] The populations of both China and India – the only nations with larger populations than the United States – are more than 4 times higher than that of the United States.  However, the United States has had more coronavirus cases than India, and nearly *100* times as many as China, as well as twice the number of deaths as India, and *more than 55* times the number of deaths as China.  Johns Hopkins University Coronavirus Resource Center, *Cases and Mortality by country, available at* https://coronavirus.jhu.edu/data/mortality.

constant  – ranks *154th* out of 165 countries.  *Id.*  Since the outbreak of the disease, the risk of dying from COVID-19 is *2300* times greater for a resident of the United States  than for residents of Taiwan, more than *1700* times greater than for residents of Vietnam, and more than *200* times greater than for residents of China.  *Id.*  The risk of death from COVID-19 is more than 137 times higher in the United States than in New Zealand, more than 77 times higher than in South Korea, more than 50 times higher than in Japan, 19 times higher than in Australia, more than 7 times higher than in India, more than 4 times higher than in Saudi Arabia, and more than 3.7 times higher than in Russia.  *Id.*

The United States is, and has been for decades, the most prosperous nation in the world.  With less than 5% of the world's population, the United States accounts for 25% of global economic activity.  Nasdaq, *The 5 Largest Economies In The World And Their Growth In 2020* (Jan. 20, 2020), *available* a*t* https://www.nasdaq.com/articles/the-5-largest-economies-in-the-world-and-their-growth-in-2020-2020-01-22.  For more than a century, the United States has also been "the global leader in science and technology," *Report shows United States leads in science and technology as China rapidly advances,* Science Daily (Jan 24, 2018), *available  at* https://www.sciencedaily.com/releases/2018/01/180124113951.htm,  and "the world leader in medical innovation."[3] Grace-Marie Turner, *Though The U.S. Is*

---

[3] For example, the United States pioneered the use of anesthetic (1844), blood transfusions (1907), the use of insulin to treat diabetes (1922), the cardiac pacemaker (1952), kidney transplants (1954), the artificial heart (1982), and vaccines for cholera (1879), anthrax (1991), rabies (1882), typhoid fever (1896), plague (1897), diphtheria (1923), pertussis (1926), tuberculosis (1927), tetanus (1927), yellow fever (1935), typhus (1937), influenza (1945), polio (1955), measles (1964), mumps (1967), rubella (1970), chicken pox (1974), pneumonia (1977), meningitis (1978), hepatitis B (1981), hepatitis A (1992), and Lyme disease (1998).  *See* Scott Harrah, *American Medical Milestones Since*

*Healthcare's World Leader, Its Innovative Culture Is Threatened*, Forbes (May 23, 2012), *available at* https://www.forbes.com/sites/gracemarieturner/2012/05/23/though-the-u-s-is-healthcares-world-leader-its-innovative-culture-is-threatened/#321d37b977eb.

This innovation is made possible, in large part, by federal government support through, for example, federal entities such as the National Institutes of Health and the Centers for Disease Control.  This support has "deep historical roots," and is "a major government function."  Institute of Medicine (US) Committee to Evaluate the Artificial Heart Program of the National Heart, Lung, and Blood Institute, *The Artificial Heart: Prototypes, Policies, and Patients, Ch. 9: Roles of Government and Industry in Medical Technology Research, Development, and Use*, National Center for Biotechnology Information (1991),  *available at* https://www.ncbi.nlm.nih.gov/books/NBK234438/.

In addition to its role in supporting health care innovation, the United States federal government plays a crucial role in responding to health emergencies.  In our public health system, it is the responsibility of the federal government to act when health threats span more than one state or region, where solutions may be beyond the jurisdiction of individual states, and where states lack the expertise or resources to respond effectively in a public health emergency.  Centers for Disease Control, *Public Health 101, available at* https://www.cdc.gov/publichealthgateway/docs/usph101.pdf.

In the face of the COVID-19 pandemic, however, the United States government has deliberately abdicated its public health responsibilities.  The two prior administrations – of George W. Bush and Barack Obama – "were sufficiently worried to put in place

---

*Independence in 1776,* University of Medicine and Health Science (July 3, 2013), *available at* https://www.umhs-sk.org/blog/american-medical-milestones-since-1776.

monitoring systems to detect pandemics and to develop playbooks for what to do in response," but the current administration "dismantled the monitoring systems and ignored the playbooks."   David Cutler, Ph.D., *New Rules for the Pandemic Era*, JAMA Forum (July 23, 2020), *available at* https://jamanetwork.com/channels/health-forum/fullarticle/2768872.  As two commentators put it:

> This was not merely a case of outright inaction. A significant complement of specific enabling statutes was enacted by 4 presidents. Appropriated, highly targeted funds were distributed to states and hospitals.  Key functionalities, such as the Biomedical Advanced Research and Development Authority, were established.  What appears to have been missing was continuous leadership powered by a sense of urgency and informed by past precedents.

Eli Y. Dashi, MD, MS & Glenn Cohen, JD, *A Legislative Blueprint for the Next Pandemic*, JAMA Forum (July 23, 2020), *available at* https://jamanetwork.com/channels/health-forum/fullarticle/2768924  In the three years of his presidency prior to the pandemic, the current President "squeezed the budget for pandemics, disbanded the federal team in charge of protecting the country from biological threats, and stripped down the Beijing office of the Centers for Disease Control and Prevention."  William Saletan, *The Trump Pandemic*, Slate (August 7, 2020), *available at* https://slate.com/news-and-politics/2020/08/trump-coronavirus-deaths-timeline.html.  And once the pandemic struck, the administration, directed by the President, "concealed the threat, impeded the U.S. government's response, silenced those who sought to warn the public, and pushed states to take risks that escalated the tragedy."  *Id.*

In early January, the President was warned about the outbreak of the virus in China, and that the Chinese government was understating its severity.  *Id.  "*This was

inconvenient, because Trump was about to sign a lucrative trade deal with Beijing." *Id.* And although the government's top health officials – Anthony Fauci, the director of the National Institute of Allergy and Infectious Diseases, and Nancy Messonnier, the director of the National Center for Immunization and Respiratory Diseases – warned that the virus was beginning to spread from China and around the world, the President announced that the United States and China were "in great shape," and that "[w]e have it totally under control." *Id.*

As the crisis worsened in China, the President's  medical advisers and national security team recommended that he suspend travel from China into the United States, but as the President told Chinese President XI, "he was counting on China to buy American goods" under the new trade agreement, and to "buy American goods and boost the U.S. economy, thereby helping him win reelection." *Id.*  The President refused his advisers' recommendation for several weeks, and then imposed a "ban" on travel from China that was "full of holes." Stephen Braun, & Jason Dearen, *Trump's early coronavirus ban on travelers from China was full of holes,* Los Angeles Times (July 4, 2020), *available at* https://www.latimes.com/world-nation/story/2020-07-04/trumps-strong-wall-to-block-covid-19-from-china-had-holes.  It contained multiple exceptions, and did not apply to Hong Kong, Macau and Taiwan, which suffered from the virus even though they are not part of the Chinese mainland.   Glen Kessler, *Trump's claim that he imposed the first 'China ban,'* The Washington Post (Apr. 7, 2020), *available at* https://www.washingtonpost.com/politics/2020/04/07/trumps-claim-that-he-imposed-first-china-ban/.  In the two months after the "ban" went into effect, nearly 40,000 people

arrived in the United States from China, and screening of those travelers was "uneven and inconsistent." *Id.*

By late January, the virus was spreading in Europe, and the administration knew that European governments had not blocked travel from China, and that the flow of passengers into Europe from China was far above normal. But although the President's deputy national security adviser "pleaded" for a ban on travel from Europe to the United States, other advisers worried that such a ban would hurt the economy in an election year, and the President refused to impose the ban until mid-March, more than a month later. *Id.*

The administration also refused to increase production of masks, ventilators, and other medical supplies that would be needed to combat the virus. When the Secretary of Health and Human Services requested funds to do so, the White House refused. *Id.* And even though the CDC began to plan for the use of the Defense Production Act – which would have greatly accelerated the production of necessary medical supplies – and members of Congress began to call for its invocation in early February, the President worried that it might upset the "business community" and refused to invoke it until the end of March. *Id.*; *Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefing* (March 22, 2020), *available at* https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-8/.

Despite WHO's warnings concerning the importance of testing and tracking in combatting the virus, the administration refused to take action to make tests available,

apparently because of the President's belief that fewer tests would lead to fewer reports of illness, blunting assertions that the administration had failed to respond properly to the pandemic.  On March 6, 2020, the President stated, falsely, that "anyone that needs a test can have a test."  *Rage*, page 274.  Five days later, while testifying before Congress, Dr. Fauci said that testing for COVID-19 was "failing, I mean, let's admit it."  *Rage*, page 279.  In June 2020, the President stated that "[w]hen you test, you create cases," and that testing "makes us look bad."  Sharon Begley, *Trump said more Covid-19 testing 'creates more cases.' We did the math*, Stat (July 20, 2020), *available at* https://www.statnews.com/2020/07/20/trump-said-more-covid19-testing-creates-morw-cases-we-did-the-math/.  Later that month, he told a crowd at a "rally" that he had asked his "people" to "slow the testing down."[4]  *Id.*

---

[4] The June 20 rally in Tulsa, Oklahoma was the President's first "rally" since the pandemic began.  Noah Weiland, *Tulsa Officials Plead for Trump to Cancel Rally as Virus Spikes in Oklahoma,* The New York Times (June 16, 2020), *available at https://www.nytimes.com/2020/06/16/us/politics/trump-coronavirus-rally.html.*  Experts warned that it would further the spread of the virus, and Tulsa officials "plead[ed]" that it be canceled.  *Id.; see also The Latest: Oklahoma's epidemiologist warned of Trump rally deaths,* Portland Press Herald (Sept. 16, 2020) (former state epidemiologist warned rally could cause additional cases and deaths), *available at* https://www.pressherald.com/2020/09/16/the-latest-most-of-isus-football-team-has-contracted-coronavirus-coach-says/.  The rally went ahead, and several weeks later, Tulsa experienced a surge of coronavirus cases "more than likely" caused by the rally.  Allyson Chiu, *Trump's Tulsa rally, protests 'more than likely' linked to coronavirus surge, health official says,* The Washington Post (July 9, 2020), *available at* https://www.washingtonpost.com/nation/2020/07/09/trump-tulsa-rally-coronavirus/.  One famous attendee of the rally – former Presidential candidate Herman Cain – died from COVID-19 six weeks after the rally.  *See* Veronica Stracqualursi and Karl de Vries, *Herman Cain dies from coronavirus,* CNN (July 30, 2020, *available at* https://www.cnn.com/2020/07/30/politics/herman-cain-dies-coronavirus/index.html.

To the extent the federal government has implemented any strategy in addressing the pandemic, that strategy has been to foist responsibility onto the states.  *See, e.g., Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefing* (March 19, 2020), *available at* https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-6/ ("governors are supposed to be doing a lot of this work . . . . [T]his is really for the local governments, governors, and people within the state.")  That strategy – which is directly contrary to the federal government's duty to address public health emergencies that extend beyond state borders, and which outstrip the states' expertise and resources to respond – has been described as "a catastrophic policy blunder and an attempt to escape blame" and "perhaps one of the greatest failures of presidential leadership in generations."  Michael D. Shear, Noah Welland, Eric Lipton, Maggie Haberman, and David E. Sanger, *Inside Trump's Failure: The Rush to Abandon Leadership Role on the Virus*, The New York Times (July 18, 2020), *available at* https://www.nytimes.com/2020/07/18/us/politics/trump-coronavirus-response-failure-leadership.html.

Ignoring warnings that the virus would continue to spread absent social distancing, the administration "rush[ed] instead to restart the economy" to boost the President's "battered re-election hopes."  *Id.*  In late February – before the virus had established a foothold in the United States – the administration's top public health officials had concluded that the federal government should take a more aggressive approach to

mitigate the disease's spread, including social distancing, stay-at-home orders, and school closures.  After announcing guidelines to close down major parts of the country for 15 days to "slow the spread," the President was, by the end of March, pushing to re-open the country by Easter despite the advice of his health experts that the shut-down be extended 30 more days.  When a CDC official's warnings caused stock prices to fall, the President "pushed aside his health and human services secretary and put Vice President Mike Pence in charge of the response," and failed to call for social distancing measures for another three weeks, "a period when the virus spread largely unimpeded."  *Id.*

As the pandemic raged, the President "waged war with science," refusing to wear a mask or encourage others to do so (and, in fact, denigrating those who did), and engaging in a "remarkable public campaign against testing."  *Id.*  On April 3, when the CDC issued new guidance for Americans to wear masks, the President announced at a Coronavirus Task Force Briefing that "this is voluntary, I don't think I'm going to be doing it."  *Rage*, page 297.  He "attack[ed]" experts, Jill Colvin, Jonathan Lemire & Zeke Miller*, White House Turns on Fauci as Trump Seeks Re-Election*, Associated Press (July 14, 2020), and issued bizarre public statements – for example, he retweeted a post by the former host of the television show "Love Connection" asserting that "[e]veryone is lying" about the pandemic, and that efforts to control it were "all about the election and keeping the economy from coming back."  *Id.*  And, in order to boost the economy (and his reelection chances), he encouraged businesses to resume operations against the guidance of health officials who warned those reopenings would lead to the surges in COVID-19 cases that did, in fact, result from those premature reopenings.  *See* Scottie

Andrew,  *The US has 4% of the world's population but 25% of its coronavirus cases,* CNN (June 30, 2020), available at https://www.cnn.com/2020/06/30/health/us-coronavirus-toll-in-numbers-june-trnd/index.html

Larry Hogan, the Republican governor of Maryland, described the President as "a man more concerned about boosting the stock market or his reelection plans" than controlling the pandemic. Larry Hogan, *Fighting Alone,* The Washington Post (July 16, 2020), *available* at https://www.washingtonpost.com/outlook/2020/07/16/larry-hogan-trump-coronavirus/?arc404=true.  Hogan wrote that the federal government's refusal to lead forced "every [state] governor to go their own way," leading to a "patchwork response" which not only proved ineffective, but which exacerbated the situation by forcing states to compete with each other (and with the federal government) for resources needed to fight the virus.  *Id.*  Hogan wrote that:

> So many nationwide actions could have been taken in those early days but weren't.  While other countries were racing ahead with well-coordinated testing regimes, the Trump administration bungled the effort.

*Id.*

Last month, the House Select Committee on the Coronavirus Crisis, joined by five other congressional committees, reported that:

> President Trump's deadly denial, distortion and delay has led to the worst federal response to a national emergency in our history. His actions are directly responsible for tens of thousands of needless deaths, tens of millions of people out of work, and mass confusion that has crippled our nation's response. Instead of taking decisive action to stop the spread of the virus, he ignored early warnings, spent months downplaying the crisis and intentionally misled the American public on every aspect of the pandemic. Trump has failed to produce an adequate national testing strategy, failed to develop a plan to safely reopen schools, failed to coordinate a 50-state strategy to respond to the pandemic and failed to use

the full power of the Defense Production Act to produce and coordinate the
distribution of personal protective equipment.

Exh. A at 3.  The Select Committee wrote that the administration failed to prepare for the
pandemic, failed to provide personal protective equipment, failed to conduct necessary
testing and tracing, "bullied states, schools and businesses to prematurely reopen,
jeopardizing millions," "misled the American people,"[5] and has "sow[n] mass confusion
that has crippled our nation's response."  As a result of this "disastrous response to the
coronavirus pandemic," the Select Committee wrote, the United States has "fared far
worse than any other country."

In sum, it has been clear from the beginning of the pandemic that COVID-19 "can
be controlled" if nations "take urgent and aggressive action."  WHO, *WHO Director-
General's opening remarks at the media briefing on COVID-19 - 11 March 2020*, *available
at* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-
the-media-briefing-on-covid-19---11-march-2020.  As the Director of the World Health
Organization said:

> We cannot say this loudly enough, or clearly enough, or often enough: all
> countries can still change the course of this pandemic.  If countries detect,
> test, treat, isolate, trace, and mobilize their people in the response, those
> with a handful of cases can prevent those cases becoming clusters, and
> those clusters becoming community transmission.  Even those countries
> with community transmission or large clusters can turn the tide on this
> virus.  Several countries have demonstrated that this virus can be
> suppressed and controlled.  The challenge for many countries who are now
> dealing with large clusters or community transmission is not whether

---

[5] In fact, the administration *deliberately* misled the American people regarding the severity
of the pandemic.  *See* Robert Costa and Philip Rucker, *Woodward book: Trump says he
knew coronavirus was 'deadly' and worse than the flu while intentionally misleading
Americans*, The Washington Post (September 9, 2020), *available at*
https://www.washingtonpost.com/politics/bob-woodward-rage-book-
trump/2020/09/09/0368fe3c-efd2-11ea-b4bc-3a2098fc73d4_story.html.

they *can* do the same – it's whether they will.  Some countries are struggling with a lack of capacity. Some countries are struggling with a lack of resources. Some countries are struggling with a lack of resolve.

*Id.*  The United States government made conscious decisions *not* to take the actions necessary to control the pandemic, allowing the pandemic to rage out of control here, and forcing the cessation of many routine activities, including jury trials like the one due James Taylor.

## ARGUMENT

The "fundamental" right to a speedy trial is  "one of the most basic rights preserved by our Constitution."  *Klopfer v. North Carolina* 386 U.S. 213, 223, 226 (1967).  The Speedy Trial Act, which effectuates the Sixth Amendment guarantee, requires that a defendant's trial begin within 70 days from the later of his initial appearance or the filing of an indictment.   The trial in this case is not scheduled until March 8, 2021, 776 days after James Taylor was indicted.[6]  Although the statute has enumerated exceptions to the rule, none of them apply in this case.

### I.  The Orders Purporting to Exclude Time from the Speedy Trial Calculation In This Case are Invalid.

The Speedy Trial Act provides that a criminal trial "*shall* commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs."  18 U.S.C. § 3161(c)(1).  The STA permits delay from a continuance to be excluded from this calculation "if the judge granted such

---

[6] Mr. Taylor has been held in pre-trial detention for more than two years, since his August 20, 2018, initial appearance.

continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial."  18 U.S.C. §3161(h)(7)(A).

On March 17, 2020, the Chief Judge of this Court issued Standing Order 20-9, declaring, in pertinent part, that "[a]ll civil and criminal petit jury trials scheduled to commence March 17, 2020 through May 11, 2020 are POSTPONED and CONTINUED pending further Order of the Court."  COVID-19 Standing Order 20-9: Court Operations (March 17, 2020).  In a series of further Standing Orders, the Chief Judge extended this period in which all criminal jury trials are postponed and continued until November 9, 2020.  COVID-19 Standing Order 20-19: Extension of Postponed Court Proceedings  (April 2, 2020); COVID-19 Standing Order 20-29: Extension of Postponed Court Proceedings  (May 26. 2020); COVID-19 Standing Order 20-62: Third Further Extension of Postponed Court Proceedings Due to Ongoing Exigent Circumstances Caused by the COVID-19 Pandemic  (July 9, 2020); COVID-19 Standing Order 20-68: Fourth further extension of postponed court proceedings due to ongoing exigent circumstances caused by COVID-19 pandemic  (August 10, 2020).  Invoking 18 U.S.C. §3161(h)(7)(A), the Court in these Orders declared that the time during which jury trials are postponed and continued shall be excluded from the Speedy Trial calculation because the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial."

The STA, however, does not permit the kind of blanket exclusion the Court has attempted here.  *First*, the STA authorizes this kind of across-the-board, court-wide exclusion only "[i]n the event that any district court is unable to comply with the time limits

set forth in section 3161(c) due to the status of its court calendars."  18 U.S.C. § 3174(a).  The Court's Standing Orders are not premised on this provision.[7]

*Second*, the STA expressly provides that no time may be excluded pursuant to the "ends of justice" exception "unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial."  18 U.S.C. §3161(h)(7)(A).  Before it may exclude time under this provision, the court must undertake  a "substantive balancing," in which it must "seriously weigh the benefits of granting the continuance against the strong public and private interests served by speedy trials."  *United States v. Rice*, 746 F.  3d 1074, 1078 (D.C. Cir. 2014) (quoting *United States v. Bryant*, 523 F.  3d 349, 361 (D.C. Cir. 2008)).  The Standing Orders contain no statement of the Court's "reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial."

Nor do the Standing Orders reflect the necessary "substantive balancing" and "serious[] weigh[ing]"  of the benefits of the postponement against Mr. Taylor's interest in a speedy trial.  In its initial, March 17, 2020 Standing Order 20-9, the Court wrote that in taking its action, it considered:

---

[7] Because it authorizes exclusion only when a court is unable to meet the STA's time limits "due to the status of its court calendars," 18 U.S.C. 3174(a), this provision of the STA provides no basis for an exclusion caused by the pandemic.  Even if it did, no time may be excluded under it unless and until "the judicial council of the circuit finds that no remedy for such congestion is reasonably available."  18 U.S.C. § 3174(b).  No such finding was made here.

- The states of emergency declared by the President and Mayor of the District of Columbia;

- The fact that, at the time, more than 100 people in the District of Columbia, and Maryland had tested positive for COVID-19;

- Unspecified "guidance" from the Centers for Disease Control and "other public health authorities" that personal contacts and public gatherings should be limited to reduce exposure to the disease and slow its spread;

- CDC guidance that gatherings of more than 50 people should be postponed;

- CDC guidance that older persons and those with chronic medical conditions are at higher risk from COVID-19; and

- The closing of all area school districts, which impinges on the availability of courthouse staff, jurors, and counsel; and

- Unspecified "other restrictions placed on public gatherings by the Mayor of the District of Columbia and other local jurisdictions.

Standing Order 20-9 (March 17, 2020).  Later Standing Orders added:

- The stay-at-home orders issued by the Mayor of the District of Columbia and the Governors of Maryland and Virginia, which "require residents to remain at home unless engaged in essential activities;

- The "announcement by the President of the United States, on March 29, 2020, that social distancing guidelines will remain in effect until at least the end of April;

- The "Opening Up America Again" guidelines issued by the White House and CDC;

- The "uptick" in positive COVID-19 tests in D.C. at the beginning of July;

- The Court's efforts to modify its facilities to permit the resumption of proceedings; and

- Concerns expressed by the United States Attorney's Office, the Federal Public Defender, and CJA counsel.

Nowhere, however, does any of the Standing Orders reflect any substantive consideration

of why and how any of these factors might preclude jury trials, nor do any of them make

any effort to weigh these matters against Mr. Taylor's strong interest in a speedy trial, or the prejudice he suffers as a result of delay.   Therefore, the Standing Orders are ineffective, under the express terms of the STA, in excluding time from the Speedy Trial Calculation.

In addition to the Standing Orders, the Court has entered Orders specific to this case, purporting to exclude from the Speedy Trial calculation the time period from March 2020 until March 8, 2021.   And like the Standing Orders, these Orders state that the exclusion is made in the "[i]nterest of [j]ustice."  But just as with the Standing Orders, none of these Orders states the Court's reasoning, and there is no evidence that in entering them, the Court "seriously weigh[ed]" the benefits of the postponement against Mr. Taylor's strong interest in a speedy trial.   Therefore, like the Standing Orders, the Orders entered in this case are ineffective, under the express terms of the STA, in excluding time from the Speedy Trial Calculation.

## II.  The Extraordinary Delay in this Case Gives Rise to a Presumption that the Sixth Amendment's Speedy Trial Guarantee Has Been Violated, and the Government Cannot Meet its "Heavy" Burden to Overcome that Presumption.

In addition to the STA, the long delay in Mr. Taylor's trial also runs afoul of the Sixth Amendment's Speedy Trial guarantee.  In determining whether a delay violates that guarantee, the Court must consider four factors: the length of the delay, the government's reason for the delay, the defendant's responsibility to assert his right, and prejudice to the defendant.  *Barker v. Wingo*, 407 U.S. 514, 530-32 (1972).   Mr. Taylor has consistently pressed his right to a speedy trial.   Therefore, the question whether his right has been

violated turns on the length of the delay, the prejudice flowing from the delay, and the government's reason for the delay.

A defendant's claim that his right to a speedy trial has been violated has "prima facie merit" when trial is delayed more than a year. *United States v. Brown,* 520 F.2d 1106, 1110 (D.C. Cir. 1975); *United States v. Holt,* 448 F.2d 1108, 1109 (D.C. Cir. 1971), *Hedgepeth v. United States,* 364 F.2d 684, 687 (D.C. Cir. 1966).  Where the delay is this long, the government bears a "heavy burden" to justify it. *Coleman v. United States*, 442 F.2d 150, 153 (D.C. Cir. 1970).  In such a case, prejudice to the defendant is "presumed and need not be affirmatively shown." *United States v. Bishton,* 463 F.2d 887, 891 (D.C. Cir. 1972).

*If* the COVID-19 pandemic has been brought under sufficient control to permit the trial in this case to begin next March, as currently scheduled, the delay in this case will have been extraordinary – 776 days (more than 25 months).   The government's "heavy burden" to justify that delay is commensurately high.   A deadly pandemic might ordinarily provide such justification, but as is clear from the comparison between the United States' response to the pandemic and that of other countries, the devastating impact of the pandemic – including the delay in this trial – is the inevitable result of deliberate choices made by the United States.  The Supreme Court has held that:

> Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun. And such is the nature of the prejudice presumed that the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows. Thus, our toleration of such negligence varies inversely with its

protractedness, and its consequent threat to the fairness of the accused's trial.

*Doggett v. United States*, 505 U.S. 647, 657 (1992) (internal citations omitted).  The delay at issue here is entirely attributable to the United States, as a result of its gross mishandling of the pandemic.  As described above, the United States' response to the pandemic has been negligent, if not grossly negligent or even reckless.   The government may not rely on its failures – the result of deliberate choices – to justify the delay in this case.

Finally, although prejudice in this case is "presumed and need not be affirmatively shown," *Bishton,* 463 F. 2d at 891, Mr. Taylor clearly has been gravely prejudiced.  The prejudice flowing from a delay "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect"; *i.e.:*

(i)      to prevent oppressive pretrial incarceration;

(ii)     to minimize anxiety and concern of the accused; and

(iii)    to limit the possibility that the defense will be impaired.

The extraordinary delay here has unquestionably been "oppressive" to Mr. Taylor, who has been incarcerated awaiting trial for more than two years, and will have been in pretrial detention for 31 months by the time his scheduled trial date arrives.  There is no guarantee that trial will begin on that date, and it is likely that this trial will be continued again due to the fact that a jury trial with multiple co-defendants may not be tenable without a vaccine for COVID-19 that is effective and available to the general public. That protracted incarceration is particularly oppressive given the ongoing pandemic – because of overcrowding and the inability to quarantine or practice social distancing, incarcerated

persons "are at great risk of sickness and death as a result of the Covid-19 pandemic." Equal Justice Initiative, *COVID-19's Impact on people in Prison* (8/21/20), *available at* https//eji.org/news/covid-19s-impact-on-people-in-prison/.

Mr. Taylor has made out a prima facie case for a violation of his speedy trial rights because the delay had exceeded one year, and the government cannot meet its heavy burden to justify the delay, because  its mishandling of the COVID-19 pandemic is the sole cause of the delay.  Mr. Taylor's speedy trial rights have been violated, and the indictment should be dismissed.  *Barker* 407 U.S. at 522; Strunk v. United States, 412 U.S. 434, 37 L. Ed. 2d 56, 93 S. Ct. 2260 (1973).

## CONCLUSION

For the foregoing reasons, Defendant James Taylor's Motion to Dismiss the Indictment for Violation of the Speedy Trial Act and the Sixth Amendment Guarantee of a Speedy Trial should be granted.

Date:  October 30, 2020                 Respectfully submitted,

Clark U. Fleckinger, II
9805 Ashburton Lane
Bethesda, MD 20817
(301) 294-7301
Fax: (301) 738-5708
cufleckinger@aol.com

/s/
Paul F. Enzinna
Ellerman Enzinna PLLC
1050 30th Street, NW
Washington, DC 20007
202.753.5553
penzinna@ellermanenzinna.com

*Counsel for Defendant James Taylor*

**CERTIFICATE OF SERVICE**

I certify that on October 30, 2020, copies of the foregoing Defendant James Taylor's Motion to Dismiss the Indictment for Violation of the Speedy Trial Act and the Sixth Amendment's Guarantee of a Speedy Trial, and the accompanying Memorandum in Support, were filed using the CM/ECF system, which will then send notification of such filing to all counsel of record.

/s/
_____
Paul F. Enzinna
Ellerman Enzinna PLLC
1050 30th Street, NW
Washington, DC 20007
202.753.5553
penzinna@ellermanenzinna.com